# The Commonwealth *versus* The Commercial Bank of Pennsylvania.

The Act of 3d May, 1850, relating to district attorneys, does not take away the authority of the attorney-general to institute proceedings by *quo warranto*, to forfeit the charters of corporations for a violation of their fundamental law.

Where the charter of a bank declared that "the rate of discount at which loans may be made shall not exceed one-half of one per centum for thirty days," a count in a *quo warranto* information against the bank charging them with "discounting promissory notes at rates of discount exceeding one-half of one per centum for thirty days," without averring that such discounts were made upon loans of money, *Held* good on special demurrer.

A count in an information against a bank charging that, "for many months past, the defendant has been in the constant practice of discounting promissory notes at exorbitant and usurious rates of interest, far exceeding the rate of one-half of one per centum for thirty days," *Held* good on special demurrer.

So also a count charging that "the defendant on the 26th October, 1854, and at divers other days before and since, discounted promissory notes at rates of discount exceeding one-half of one per centum for thirty days," *Held* good on special demurrer.

So also a count charging that "the defendant on the 4th May, 1854, and on divers other days before and since, made loans at rates of discount exceeding one-half of one per centum for thirty days," *Held* good on special demurrer.

It is no objection to counts in the form of the above, that they do not make any reference to the particular notes discounted, with their parties, dates, and amounts. It is the diversion of its business out of the prescribed way that constitutes the offence by the bank, though the proof of it can be made out only by giving particulars. The particulars which it is thought ought to have been given, are not the offence charged, but the evidence of it, and are properly left out. The offence is doing an unauthorized business, and it may be charged in as general terms as those used in an indictment for any prohibited employment or business.

Where a bank is prohibited in its charter from making loans at a greater rate of discount than one-half of one per centum for thirty days, and also from dealing in anything but bills of exchange, gold or silver bullion, bank stock, United States stock, treasury notes, and goods really pledged for money lent and not redeemed in time; a count in an information against the bank charging them with "dealing in promissory notes," without charging the taking of unlawful discounts, *Held* bad on special demurrer. A count in such information charging them with "dealing in promissory notes, by purchasing the

[The Commonwealth *v.* The Commercial Bank.]

same at rates of discount greatly exceeding the rate of one-half of one per centum for thirty days," *Held* good on special demurrer.

Where a bank is prohibited by its charter from making loans at a greater rate of discount than one-half of one per centum for thirty days, but is expressly authorized to deal in bills of exchange, a count in an information against them charging them with "discounting bills of exchange at rates of discount exceeding one-half of one per centum for thirty days," *Held* bad on special demurrer.

If they were proper bills of exchange, that is, drawn upon a distant place, the discount is not for a mere loan upon time, but may be a purchase, with the discount regulated upon considerations of place as well as of time.    But,

A count in such an information charging that the bank on a certain day discounted a certain bill of exchange *payable at the city of Philadelphia*, at the rate of one and one-eighth of one per cent. for thirty days, with intent to evade and violate the law, *Held* good on special demurrer.   For, the bill being payable at Philadelphia, where the bank is located, this is not a case of exchange at all, but a mere discount of a domiciliary bill, for which they can only charge the rate fixed by law.

QUO WARRANTO.  This case was argued on several demurrers taken by the defendant to an information filed by the attorney-general, upon which information a writ of *quo warranto* had issued out of this court.  The original information consisted of two counts. *In the 1st count* it was charged that the defendant " for many months past has been in the constant practice of discounting promissory notes at rates of discount exceeding one-half of one per centum for thirty days."  *In the 2d count* it was charged that the defendant " has for a long time past, to wit, from the 1st May, 1854, been engaged in dealing in promissory notes, contrary to the express prohibition contained in the fundamental articles of incorporation."

The original information had, upon motion of the Commonwealth's counsel, been amended by filing twelve additional counts. Of these *the 8th count* charged that the bank " for many months past has been in the constant practice of discounting promissory notes at exorbitant and usurious rates of interest far exceeding the rate of one-half of one per centum for thirty days—that the bank on the 8th May, 1854, discounted certain promissory notes, and received an usurious, unlawful, and prohibited interest or discount for so doing, amounting to $233.50;" and setting out the same offence in the same terms on forty-three other days, with the amounts of usurious discounts received on each day.

*The 9th count* charged that the bank " heretofore, to wit, on the 26th October, 1854, and at divers other days before and since, discounted promissory notes at rates of discount exceeding one-half of one per centum for thirty days."

*The 10th count* charged that the bank " heretofore, to wit, on the 31st day of August, 1853, and at divers other days before and since, discounted bills of exchange at rates of discount exceeding one-half of one per centum for thirty days."

*The 11th count* charged that the bank " heretofore, to wit, on

[The Commonwealth *v.* The Commercial Bank.]

the 4th May, 1854, and at divers other days before and since, made loans at rates of discount exceeding one-half of one per centum for thirty days."

*The* 12*th count* charged that the bank " on the 31st August, 1853, discounted a bill of exchange for the sum of $5000, dated the 4th August, 1853, drawn by S. L. Hodge upon Farnham, Kirkham & Co., Philadelphia, accepted by them, and payable *at the city of Philadelphia,* 6 months after date—that the bank discounted this bill at a rate of discount greatly exceeding one-half of one per centum for thirty days, viz., at the rate of one and one-eighth of one per centum for thirty days, with intent to evade and violate the law," &c.

*The* 13*th count* was the same as the 12th, except that the bill of exchange which was alleged to have been discounted at a usurious rate, was of different date. It was for the same amount, between the same parties, and was, like the other, *payable at Philadelphia.*

*The* 14*th count* charged that the bank, " on the 6th July, 1854, and on divers other days, before and since, has dealt in promissory notes, by purchasing the same at rates of discount greatly exceeding the rate of one-half of one per centum for thirty days."

To this information the defendants first demurred generally; under which demurrer they raised the question, whether the attorney-general, since the passage of the Act of 3d May, 1850, relating to district attorneys, had authority to institute this proceeding against them.

They also demurred specially to each several count of the information, and assigned as causes of demurrer:—

1. That in all the counts the defendants are averred to be subject to the fundamental articles, provisions, and restrictions contained in the original Act of Incorporation of 21st March, 1814, and in the Act of 25th March, 1824; whereas it appears, by the several Acts of Assembly referred to in said counts, that their corporate existence had been extended from time to time, and that, by virtue of the Act of 2d April, 1849, extending the charter for fifteen years, they became subject to the General Bank Act of 16th April, 1850, and that, consequently, they ceased to be subject to the Acts of 1814 and 1824.

2. They assigned as causes of demurrer to the 1st, 8th, 9th, 10th, 12th, 13th, and 14th counts, that the said counts do not aver that the said supposed discounts were upon *loans* made by said defendants.

3. They assigned as causes of demurrer to the 1st, 8th, 9th, 10th, 11th, 12th, 13th, and 14th counts, that the said counts do not specify any of the particulars of such alleged unlawful discounts—that they do not specify the names of parties, the dates of

[The Commonwealth *v.* The Commercial Bank.]

the discounts, the time of forbearance, the sums forborne, or the sums to be paid for such forbearance.

4. They assigned as causes of demurrer to the 2d and 14th counts, that they are therein charged with dealing in promissory notes " contrary to the express prohibition contained in the fundamental articles of incorporation," whereas no such prohibition is contained in such fundamental articles.

5. They also assigned as cause of demurrer to the 2d and 14th counts, that they are therein charged with dealing in promissory notes, but that the said counts do not allege any facts to maintain such averments, or any of the particulars of such alleged dealing.

6. They also assigned as causes of demurrer to the 1st and 14th counts, that they were double and multifarious.

*E. Waln, C. Ingersoll,* and *W. M. Meredith,* for the demurrers. —The power of the attorney-general to file this information is taken away by the Act of 3d May, 1850, which gives the district attorneys power to conduct all prosecutions in the name of the Commonwealth.

The defendants are not subject to the provisions of the Acts of 1814 and 1824. The Act of 1849, which extended their corporate existence for fifteen years, brings them under the general law of 1850.

The information is bad for want of certainty : Hoppet *v.* The United States, 7 *Cranch* 309; Janson *v.* Stewart, 1 *Term R.* 748; Buckwalter *v.* United States, 11 *S. & R.* 193; Livermore *v.* Boswell, 4 *Mass.* 437; 11 *Eng. Com. Law* 461; 29 *Eng. Com. Law* 173; 17 *Johns. R.* 439; 13 *Id.* 428; 8 *Id.* 218; 7 *Missouri R.* 237; 3 *Scammon* 330; 6 *Blackf.* 133; *Id.* 378; 4 *Arkansas* 44; 2 *Maule & Sel.* 377; Evert *v.* Barr, 4 *Y.* 99; People *v.* Manhattan Co., 9 *Wend.* 351; People *v.* Kingston Co., 23 *Id.* 193.

*M. Russell Thayer, St. George T. Campbell,* and *The Attorney-General,* contrà.—The Act of 14th June, 1836, makes it the duty of the attorney-general to file this information. No other person can do it : Murphy *v.* The Farmers' Bank, 8 *Harris* 415. His functions, in this particular, partake both of a judicial and political character. It cannot be supposed that the legislature intended, by the Act of 1850, to take these functions from the attorney-general and vest them in local officers.

The defendants are still subject to the Acts of 1814 and 1824. The Act of 1849 extends their corporate existence, and subjects them to all general laws then in force for the regulation of banks. The subsequent Act of 1850 can have no effect on the charter previously granted. Besides, this point has already been decided by this court, in this case, on the motion to quash the writ of *quo warranto.*

The information is sufficiently certain. It sets forth the viola-

tions of the charter with all the certainty which the character of the transactions permits.   The charge is not of a single offence, but that they were in the constant practice of making discounts . at usurious and unlawful rates.   They cannot compel us to set out our proofs in our pleadings.   What is prohibited in their charter is discounting at usurious rates.   That we have charged in the words of the statute, and it is sufficiently certain: The Emily, 9 *Wheat.* 381; The Merino, *Id.* 391; People *v.* Bank of Hudson, 6 *Cowen* 217; State Bank *v.* The State, 1 *Blackf. Ind. R.* 277; Corwin *v.* Ins. Co., 14 *Ohio* 7; Com. Bank *v.* Mississippi, 6 *Smedes & Marshall* 600.

The opinion of the court was delivered by

LOWRIE, J.—On the first demurrer the defendant raises the question, whether the Act of 3d May, 1850, relating to district attorneys, does not take away the authority of the attorney-general to institute this proceeding.  We do not think that it does.  It was intended to vest in the district attorneys an independent authority, instead of the one dependent upon the attorney-general, which his deputies had before.

It does not deprive the attorney-general of the authority expressly given him to institute this proceeding, and possibly it has affected his authority no further than in taking from him his former power of appointment, and in the authorities incident to that power.

It is also argued that the defendant is not subject to the provisions of the bank law of 1824, which fixes the rate of discount, and prohibits the banks from dealing or trading in anything but bills of exchange, gold and silver, bullion, &c.; but when this cause was up before on the motion to quash the complaint, we decided otherwise, and we do not now see any reason for changing the opinion which we then expressed.   There is an objection to the original information (called the first count) for duplicity, which requires us to notice the whole frame of the original information and of the additional counts.   The original information is not one count, but two.  It commences with matter of inducement or introduction relative to the rights and duties of the bank, and then, in the light of these explanations, makes two charges against the bank for a breach of its duties.

It is the unnecessary and cumbersome repetition of this matter of inducement along with each of the additional counts, that gives to the original information the appearance of one count.   It is in fact two, and therefore there is no ground for charging it with duplicity.   The same objection of duplicity is raised to the last count, but we do not see that it is well founded.

Objection is made to several of the counts, because they simply charge the bank with " discounting" promissory notes at rates

exceeding that fixed by law, and without averring that such discounts were made upon loans of money. This objection may be here considered. The objection is, that the bank is charged, not with "making loans" at prohibited rates, but with "discounting" at prohibited rates. Can these terms, in any fair, frank, and truthful interpretation, be regarded as conveying different meanings, when used in regard to promissory notes?

Certainly the primary sense of discount is not identical with loan; but by a perfectly natural figure of speech it has acquired the sense of loan, and the two words are used interchangeably for the same idea. The principal idea is that expressed by the word loan, and a means of effecting it, and therefore part of the transaction is by discount; and the part here comes at last to be used for the whole, discount for loan, just as naturally as we use the word yoke for the oxen that are to bear it, when we say, a yoke of oxen.

All languages are full of words with such secondary meanings, and they are just as legitimate, when sanctioned by usage, as the primary meanings. If, in the connexion in which they are placed, they are not ambiguous, no fault can justly be found with them. In ordinary parlance among merchants, bankers, and other trading men, it is quite as usual, perhaps much more so, to speak of banks making discounts, of getting discounts from them, of offering notes for discount, and of curtailing discounts, as it is to speak of getting, making, asking, and curtailing loans; and both forms of expression are used as entirely equivalent.

Webster defines discount "to lend or advance the amount of a security, deducting interest," &c. A note is discounted in order to lend money to a person, the money is lent after having made this discount, and hence discount has come to be used for loan.

And this use of the word discount is very common in our Acts of Assembly relating to banks. It is several times so used in the Act of 1824. This bank acts continually on the provision that "ordinary *discounts* (loans) may be made by the president and four other directors." The article fixing the rate of discounts is first found in the charter of the Bank of Pennsylvania, 1793, where discounts and loans are used as equivalent words in saying "that the bank shall not take more than half per cent. for thirty days, for or upon its loans or discounts," and the same is repeated in the charter of the Philadelphia Bank, 1804: 3 *Sm.* 103; 4 *Id.* 149. It would be a wearisome task to write or to read the numerous instances in which these words are used as equivalent in the language of legislation, and it would add no strength to what we have been saying; for we naturally expect the legislature to make a free use of the common language of the people in expressing their ideas; and, therefore, incline to require proof that they have not, rather than that they have, used these words as equivalent.

[The Commonwealth v. The Commercial Bank.]

When, in ancient times, our legislators and judges did not understand English, but only French and Latin, it was perfectly natural for them to speak, and write, and be addressed in those languages, and they might very well reject, as unintelligible or ambiguous, documents that were written in plain English, because to them they would be so.

But now all legislative and judicial proceedings are conducted in English, that is, in a language formed by the people themselves and not by their rulers, and it is impossible to reject a document for indefiniteness that expresses a perfectly clear and unambiguous idea, according to the language of the people. It would certainly raise a smile on the face of every man of business in the state, if we should say that the word discounting, as used in this information, does not convey the idea of making loans and of nothing else.

We think the objections made on this account are not sustained. Other objections to this information are founded on a supposed want of definiteness in specifying the acts of which the several offences consist. In testing the validity of these objections, we should greatly fail in systematic consistency if we should look only to the extreme and peculiar cases that are to be found in English jurisprudence, without regard to their history and to the general spirit of our own law on this subject.

Where a people consist of a ruling and a subject race, there always exists an internal jealousy, uneasiness, and discord, that give rise to very severe criminal laws; and this severity remains long after this distinction of races has passed away, and a real homogeneousness has taken its place. But then, the old severity of the laws has lost the support of the circumstances which caused that severity to be felt necessary, and the judicial heart seeks some compensation for the severity that has become unnecessary and odious, by requiring great strictness in the charge and proof of the offence.

Such was the origin of much of the old strictness of practice in penal and criminal proceedings, but it has been gradually passing away, because it has been gradually losing its reason and support. The general principle of practice now requires certainty only to a common intent; though there still remain classes of cases in which this general principle is hardly yet admitted.

Some classes, of which usury is one, stand on a peculiar principle in the strictness which they demand; because the penalty is measured by the offence as charged and proved, the amount lent must be exactly laid, because it defines the penalty. In other cases, the time during which an offence is continued must be stated, because the sentence is measured by it: 11 *S. & R.* 193.

And, in England, much of their strictness presented itself in relation to the conformity of the proof with the allegations, which

[The Commonwealth *v.* The Commercial Bank.]

has become almost obsolete with us in general practice, because of our liberal allowance of amendments, even in penal actions (4 *Watts* 55; 4 *Cow.* 95); and in some cases we have provided against any undue demands of certainty by declaring that charging the offence in the language of the law, without the usual technical particularity, shall be sufficient.

In England they have endeavoured to get clear of these "technical niceties" in criminal cases, by the statute 7 Geo. 4, c. 64, § 19–21.

We shall be quite strict enough in dealing with the sufficiency of this information, if we test it by the principles of criminal practice. The question is, what degree of certainty is required in describing the offence? It must be certainty to a common intent. Mr. Justice SERGEANT says, 8 *Watts* 213: "It is sufficient, in indictments, that the charge be stated with so much certainty that the defendant may know what he is called on to answer, and that the court may know how to render the proper judgment thereon."

Chief Justice GIBSON says, 5 *State R.* 66: "Precision in the description must be sufficient to 'mark the limits of the accusation and fix the proof of it.' The purpose to be aimed at in describing the offence, is to define the act and the criminal element contained in it, so as to point the proof and the defence, and furnish reasonable security against the repetition of the charge. It is not sufficient to classify the offence, as by charging a man simply with larceny; but there must be sufficient when and where to mark the one act of the class to which it belongs, and it is for this purpose that circumstances of time and place must be given:" 6 *S. & R.* 10; 7 *State R.* 439.

It is not necessary that the acts constituting the offence be particularly described with all their circumstances, if it can be distinctly defined without this, and much of the particularity of pleadings comes from an abundant caution, rather than from the requirements of the law. But many offences are composed of a class of forbidden acts, punishable as a class; and such offences are properly described by the general term under which the acts constituting them fall, and are individuated only by time and place.

Of this character are the offences of common barratry, vagrancy, common gambler, keeping a tippling-house, or disorderly or gambling-house, or being engaged in the slave trade, or in selling lottery tickets, or carrying on the business of a tavern-keeper, broker, or pilot, without license. See 6 *Cowen* 217; 13 *Missouri R.* 342; 2 *Alab.* 451; 11 *Barb. S. C.* 213; 8 *Texas* 255.

In some of these instances the particular acts that constitute the offence are not criminal by themselves, but only by frequent repetition; and some of them, when alone, are criminal in a dif-

[The Commonwealth v. The Commercial Bank.]

ferent sense. In all of them, the offence is better described by its class name, with time and place, than by any conceivable particularity of facts.

In some cases both the particular and the general acts are made criminal, and then the particular act must be individuated if it is it that is charged, and the general act must be individuated as general, if it is it that is charged.

If we cannot charge a general act, or fact, or business, or course of conduct by its general name, without specifying the particulars that constitute it; then in order to be consistent, we ought to banish all general terms from legal documents, and try if we can draw any charge without them. A common indictment for assault and battery, is respectable chiefly because of the general form in which the offence is described; and it would be excessively odious if it described all the possible hundred offensive acts, very different in form, intensity, and aim, of which an assault and battery consists.

After coming to these general conclusions on the character of the precision required in making penal charges, we may come to the special case under consideration. What is the law, and how is its transgression alleged? The law is, " the rate of discount, at which loans may be made, shall not exceed one-half of one per cent. for thirty days."

The transgression of it is variously charged. In the first count it is, "that for many months past the defendant has been in the constant practice of discounting promissory notes at exorbitant and usurious rates of interest, far exceeding the rate of one-half of one per cent.," and then the amount of excess of discount taken in the several months of May to October, 1854, is given.

The eighth count (or third, leaving out the abandoned ones), differs from this only by stating the daily excess of discount taken in the same time. The ninth charges that the defendant, " on the 26th October, 1854, and at divers other days before and since, discounted promissory notes at rates of discount exceeding," &c., without any particulars.

The tenth is the same, but with the time, 31st August, 1853. The eleventh is, that the defendant, " on the 4th May, 1854, and on divers other days before and since, made loans at rates of discount exceeding," &c.

It is objected to all these charges, that they are defective in not making any reference to the particular notes, with their parties, dates, and amounts, which the defendant is charged with unlawfully discounting.

We are of opinion that this is not necessary, and what we say on this will apply to the same objection to other counts. The law fixing the rate of discount is a fundamental law of the bank, re-

[The Commonwealth *v.* The Commercial Bank.]

quiring that it shall not do business except in the manner therein laid down.

In doing its business it may take discounts at the given rate and at no higher.   It is the form of the bank's business that the law intends to direct and limit, and it refers to no special acts, except so far as the particular is always necessarily involved in the general.

It is the diversion of its business out of the prescribed way that constitutes the offence, though the proof of it can be made out only by giving particulars.   The particulars which it is thought ought to have been given are not the fact charged, but the evidence of it, and are properly left out.   The offence is doing an unauthorized business, and it may be charged in as general terms as those used in an indictment for any prohibited employment or business.

It is another fundamental law for the conduct of business of this bank, that it "shall not deal or trade in anything but bills of exchange, gold and silver bullion," &c., and not excepting promissory notes.   In the second count of the original bill it is charged, that the defendant has "for a long time past, to wit, from 1st May, 1854, been engaged in dealing in promissory notes, contrary," &c., without charging the taking of unlawful discounts.

This is answered by saying that the defendant is not forbidden to deal in them.   The fourteenth count charges that the defendant on the 6th July, 1854, and on divers days before and since, "has dealt in promissory notes by purchasing the same at rates of discount greatly exceeding the rate of one-half of one per cent. for thirty days, that large numbers of promissory notes were bought by said bank, during the times aforesaid, at various rates of discount, greatly exceeding the rate of one-half per cent. for thirty days," and to this the answer is again, that the defendant is not forbidden to do so.

It is worthy of notice, that the law does not expressly define what are the general powers, or what is the general business of banks.   These are left to be ascertained according to the customs of the country, except so far as they are expressly limited.

They and their branches are sometimes called banks and offices of discount and deposit, and thus their business of lending money or receiving deposits is distinctly recognised.   The early banks had no express authority to issue notes; yet their issues were protected against counterfeiting: 3 *Sm.* 188.

And this shows that the authority to issue notes was implied. They were, therefore, banks of loan, deposit, and circulation; and to this may be added the business of collecting the money due to their customers on negotiable securities.

But this business could not be carried on unless by dealing in

[The Commonwealth v. The Commercial Bank.]

bonds, mortgages, notes, drafts, and money, and therefore it is implied that they may so deal; yet, in doing so, they can make no discount for time, or the risk of repayment, except at the rate specially authorized; and this restriction is to be treated as so far a part of the laws against usury that no device can be allowed as a means of evading it; but this does not at all prevent them from charging for the expenses of collecting money at another place.

This objection to the second count of the original information is therefore sustained, and to the fourteenth is overruled.

But if banks could carry on no business but the kind already spoken of, their real business would be entirely local, and they could not accommodate the business of their own community by buying the drafts on debtors at another place, or by selling them drafts in order to pay their debts at another place.

It was no doubt in order to extend their usefulness, and to enable them to act as agents in effecting distant exchanges, that they were authorized to trade and deal in bills of exchange.

This is a term that is not commonly applied to mere domiciliary drafts or orders, though the law calls all alike bills of exchange, because there are but few points of distinction between them. It did not need any special authority to entitle the bank to deal in these domiciliary drafts so far as to lend money on them, and dispose of or transfer them; for there is no limit on the forms of the security which they may take in making loans.

But if they may buy and sell domiciliary drafts, and drafts drawn abroad and payable at their place of business, without any limit, then they have an open field for evading the law fixing the rate of discount; for their borrowers, in their need, will always suit the form to their wishes, and then all banks that please will become mere shaving shops, except for their directors and a few favourites.

Bills of exchange, in the most proper sense of the term, are means of collecting money due at another place, or of transferring money or its equivalent from one place to another; and it is this kind of bills that the bank is expressly authorized to deal or trade in.

Our law does not refuse to enforce a draft drawn by one man on his next door neighbour, because it allows people to make their contracts in their own form; but such a form is senseless and altogether unusual, and will remain so, unless we sanction the principle insisted on here that banks may buy such drafts without any limit of discount.

This allowance to banks to deal in bills of exchange is found in the charters of all banks from the first (2 *Sm.* 200) down to the present; and it has never been understood in the latitudinarian sense now contended for.

[The Commonwealth *v.* The Commercial Bank.]

This proper sense of a bill of exchange is carefully preserved on the continent of Europe. Domat, Pothier, and others define it as a means of transmitting money from one place to another, and they are followed by the *French Code of Commerce*, § 110.

And a remark of Pothier's (*Cont. de Change*, § 55), is very applicable here: "In order," he says, "that the contract of exchange be truly such, and not a loan of money, the bill of exchange which I give you here, for the money which you give me, must be drawn upon another place of trade. The form of a bill of exchange does not make it really one." And this agrees with the first definition which we find in our law of an inland bill of exchange.

In the statute 9 & 10 Will. 3, c. 17, they are first recognised as valid, and are there defined as drawn at one town or place in the kingdom upon a person at another town or place.

These views will aid us in deciding upon the sufficiency of the other parts of the information that are objected to. The tenth count charges that the defendant, "on the 31st August, 1853, and on divers other days before and since, discounted bills of exchange at rates of discount exceeding one-half of one per cent. for thirty days." To this it is objected that it was not alleged that the said discounts were upon loans made by the defendant, and we think this objection is well taken in substance if not in form. If they were proper bills of exchange, that is, drawn upon a distant place, the discount is not as for a mere loan upon time, but may be a purchase with the discount regulated upon considerations of place as well as of time. If it had been alleged that they were domiciliary drafts, payable at the place where they were discounted, then the alleged discount would have been unlawful, and the count would have been sufficient. As it is, the objection is sustained.

The same objection is taken to both the twelfth and thirteenth counts, which severally present single acts in violation of law, in the same form. With sufficient distinctness, they both charge that the defendant, with intent to evade and violate the law, discounted a certain bill of exchange (different in each) payable at the city of Philadelphia, at the rate of one and one-eighth of one per cent. for thirty days. This is not a case of exchange at all, but a mere discount of a domiciliary bill, and, we have already said that the rate fixed by law, is the only discount allowed for such a case. We think the objections to these counts are not sustained; the demurrer to the second count of the original information, and to the additional count, numbered ten, are sustained and all the other counts are adjudged sufficient in law, and as to them, it is ordered, that the defendant do further answer to the said information within thirty days, or judgment.

WOODWARD, J., dissented.