# First National Bank of Clarion *versus* Gruber.

1. A bank is a private corporation and its charter a private act to be pleaded and proven as all other private acts, and unless so pleaded and proven the court will not take judicial notice of its provisions.

2. It was contended that under the Act of Congress establishing national banks, those institutions have a right to charge and receive whatever amount of interest any banks of issue chartered by the state have a right to receive, and that there being in existence state banks of issue authorized to charge and receive more than six per cent interest, the court was bound to take judicial notice of the fact. *Held,* that the court was not bound to take judicial notice of such institutions unless their charters were produced and proven.

3. What constitutes a "bank of issue" discussed, and a review of the decisions and legislation relating to banks made by AGNEW, C. J.

October 26th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, and TRUNKEY, JJ. WOODWARD, J., absent.

Error to the Court of Common Pleas of *Clarion county :* Of October and November Term 1878, No. 38.

Debt by John Gruber against the First National Bank of Clarion.

The material facts are set forth in the report of the preceding case of Gruber *v.* The First National Bank of Clarion, which was

[First National Bank of Clarion *v.* Gruber.]

a writ of error taken by the plaintiff to the same judgment. The questions considered and disposed of on the present writ are stated in the opinions of this court.

*Wilson & Jenks*, for plaintiff in error.—The court erred in charging that the plaintiff was entitled to recover the excess over six per cent., because the Act of Congress permitted the defendant to collect the same rate of interest or discount that under the laws of Pennsylvania others might charge. Other banks in Pennsylvania were permitted to charge over six per cent., to whatever extent the parties might agree. *Vide* act incorporating Franklin Bank of Philadelphia, Pamph. L. 1870, p. 737, sect. 4. The court should take judicial notice of banking acts. In Sedgwick on Statutory and Constitutional Law, p. 119, the following language is used: "Courts are bound to take notice of statutes establishing banks and regulating rates of exchange." Then if the courts are bound to take judicial notice of the rates of exchange, in the case of The First National Bank of Mt. Pleasant *v.* Duncan Bro's, 25 Pitts. Leg. Jour. 169, it is ruled that national banks, under the Act of Congress, may lawfully take or receive as high a rate of interest or discount as the highest under the state laws; which is largely in excess of six per cent.

*W. L. Corbett*, for defendant in error.—The Franklin Bank, referred to by counsel for plaintiffs in error, is not a bank of issue, and it is only where banks of issue, created under state charters, are allowed by the state to take a greater rate of interest than that allowed by the general law, that the right of national banks in that respect is enlarged or extended beyond the limit fixed by the general law. It is submitted that no bank of "issue" was, at the time of the passage of the Act of Congress of 1864, or has been since, authorized to take interest in excess of six per cent.

Mr. Justice SHARSWOOD delivered the opinion of the court, January 6th 1879.

As the judgment in this case has been just reversed on the writ of error, sued out by the plaintiff below, and a *venire facias de novo* awarded, it will be unnecessary to consider in detail the fifteen errors assigned on this record. It is quite sufficient to say that under the decision of this court in Lucas *v.* Government National Bank, 28 P. F. Smith 228, we find no error in the answers of the learned court below of which this plaintiff has any cause to complain. The objections to evidence which were overruled, were on the grounds of variance to counts in the declaration, upon which, in the end, the court did not enter judgment. There is technically an error in the judgment, according to the view of the learned court below. The counsel on both sides assumed that the last

[First National Bank of Clarion *v.* Gruber.]

count in the declaration was three counts from its including in one demand debt for money had and received, money paid, laid out and expended, and money found due on an account stated. The entry of judgment on the last three counts was in fact an entry of judgment on the ninth, tenth and last count; the ninth and tenth being for the penalty. The judgment is wrong and must be reversed, although if the cause had not to go back for another trial, this error might be corrected in this court.

What the learned counsel for the plaintiff in error principally insisted upon in his oral argument, as ground for a reversal without a *venire de novo*, was a point which does not appear to have been made below and which does not arise on this record. It is contended that under the Act of Congress establishing the national banks, those institutions have a right to charge and receive whatever amount of interest any banks of issue chartered by the state have a right to receive, and that several banks of issue were incorporated and in existence during the period that the alleged usury was paid in this case, who might lawfully make any contract with their debtors on the subject of interest. In the Circuit Court of the United States for the Western District of Pennsylvania, the point was so ruled by Justices Strong and McKennan, reversing a judgment in the District Court: First National Bank of Mt. Pleasant *v.* Duncan, 25 Pitts. Leg. Jour. 169. The ruling in that case was on the rejection by the District Court of an offer to show that there were state banks of issue authorized by special charters to charge and receive more than six per cent. We give no opinion upon this question. No offer was made in the court below to give such evidence. It is contended now that the court will take judicial notice of the fact. No doubt in New York and other states the court will take judicial notice of institutions organized under a general banking law. Although the general banking law of April 16th 1850, Pamph. L. 477, is undoubtedly a public act, and where the charter of any particular bank is produced and proved, the court will take judicial notice of its provisions; yet without such proof it cannot take notice of the charter. A bank is a private corporation, its charter a private act, to be pleaded and proved as all other private acts. It has been held by the District Court of Philadelphia, in Handy *v.* The Philadelphia & Reading Railroad Co., 1 Phila. R. 31, that an act which declares that loans and contracts, previously made by any person with a particular corporation, shall not be deemed usurious by reason of the corporation agreeing to pay more than legal interest, is a private act.

Judgment reversed and *venire facias de novo* awarded.

Chief Justice AGNEW filed the following concurring opinion:
The 5197th section of the Revised Statutes of the United

States providing for the rate of interest to be charged by the national banks is in these words, viz. : "Any association may take, receive, reserve and charge on any loan or discount made, or upon any note, bill of exchange or other evidence of debt, interest at the rate allowed by the laws of the state, territory or district where the bank is located, and no more; except that where by the laws of any state, a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized or existing in any such state under this title. When no rate is fixed by the laws of the state or territory or district, the bank may take, receive, reserve or charge a rate not exceeding seven per centum., and such interest may be taken in advance, reckoning the days for which the note, bill or other evidence of debt has to run." The rest of the section is not material. The intent of Congress not to interfere with the general rates of interest established by each state is manifest in the first clause of this section, and is strengthened by the next section (5198), forfeiting the entire interest in case a greater rate is charged. This was a duty the government owed to the states, in order to impair as little as possible the established policy of the state, in which its people are educated. If the state has no established policy and has fixed no general rate of interest, the third clause provides for a rate not exceeding seven per cent. But a contingency might arise, where a rate differing from the general rate, might be established by the state for its own banks of issue. This, therefore, was made the subject of the exception in the second clause. Banks of issue having the power to issue circulating notes would compete with the national associations, and their rate of interest was to be allowed to the latter, if it exceeded the general rate established by law. But what state banks are banks of *issue* is plainly a state question, to be decided by the laws and tribunals of the state, and to be followed by the federal judiciary.

If according to the state decision a particular state bank, or a class of banks, has not the power to issue circulating notes, the issue would be illegal and the charter of the bank might be forfeited. On the other hand if the state banks or the class have the power to issue circulating notes by state decision, the jurisdiction of the federal law over the rate of interest attaches, and national banks will be allowed the same rate. These principles, it seems to me, are plain, and determine when the decisions of the state courts must govern.

It is our province therefore to declare whether the banks of this state, termed savings and deposit banks, are banks of issue, or, in other words, have the power to issue circulating notes. That they are not, is, I think, very clear. They are, with a very few exceptions, of modern date, and have never in practice been recognised as having this power; besides all the charters I have examined,

[First National Bank of Clarion *v.* Gruber.]

and I think I omitted none, since the passage of the general bank act of 1850, have an express provision against the power to issue bank or circulating notes.

If we examine the legislation of this state on the subject, it will be found, that only those known as "banks," or "banking institutions," in the language of the laws, are banks of issue, and they are governed by a complete system existing since 1814. This system began in the act vetoed by Governor Snyder, and repassed on the 21st of March 1814. This law was followed by the act of 25th March 1824, rechartering the banks then existing; many have failed, chartered by the act of 1814. Between the date of the act of 1824, and the passage of the general bank act of 16th April 1850, many special charters were passed, but in all, the banks were subjected to the provisions of the acts of 1814 and 1824, mostly in express words, and in some by subjecting them to all the laws relating to banks. The act of 1824 was almost a transcript of the act of 1814, with some amendments suggested by experience. When we reach the act of 1850, we find it to be almost a repetition of the acts of 1814 and 1824. Many of its sections are nearly exact transcripts. All the banks since chartered by special acts are expressly subjected to the provisions of this act.

This history, as well as the terms of the act of 1850, proves conclusively that the first section of the act of 1850 is intended to apply to banks, such as are provided for in the acts of 1814, 1824 and 1850, viz., to banks of issue only. That section is in these words: "That every banking corporation hereafter created by any special act of the General Assembly, and every bank hereafter rechartered, or the charter of which shall be hereafter extended or renewed by any such Act of Assembly, shall be subject to the provisions of this act." The very language of the section, as well as the subsequent provisions to which it refers, makes it evident that it was intended to apply only to banks or banking institutions having the power to issue circulating notes as money. These provisions and many others in the fundamental articles are wholly inapplicable to savings and deposit banks.

I am therefore clearly of opinion that the general bank act of 1850 does not embrace savings and deposit banks. It is highly important that the state judiciary should preserve the manifest distinction made by the legislature between banks of issue and savings and deposit institutions, not merely as bearing on the question of the rate of interest of the national banks, but because of its important bearing on the policy and internal economy of the state in regulating her institutions. I venture to say no one familiar with the legislation of the state has ever thought the act of 1850 applied to these minor institutions, until pecuniary astuteness developed the idea.

But a more conclusive argument is found in the legislation itself

relating to savings and deposit banks. I have examined many charters, and all have a provision forbidding the bank to issue its own bills in the manner of bank notes for circulation as money, and subjecting them to the penalties of the bank acts for so doing. And this is not all. A general act was passed November 6th 1856, Pamph. L. 1857, p. 797, extending the 30th section of the general bank act of 1850 to "all incorporated banking, saving fund, trust and insurance companies," with the proviso that nothing therein contained should " authorize any savings bank, trust, or other company to create any bank note or certificate in the similitude of a bank note."

But we have been referred to the charter of the Franklin Bank of Philadelphia, Act April 1st 1870, Pamph. L. 736. Whether there are others similar I do not know, having seen no other, but this is a special act, and anomalous certainly as to the provision for interest. It is evidently one of those special laws run through by influence, and without a consideration of consequences, and certainly out of harmony with all our legislation as to banks. It has but four stockholders named in the charter, and it allows the bank to lend money and discount paper " at such rates of interest as may be agreed upon by the parties," and again, " at such rates of interest as may be agreed upon by said bank and the borrowers." This is the only special charter of this kind we have been referred to, and if it be held to be a means of overturning the settled policy of the state as to the rate of interest to be charged by individuals and by banks of issue, it will be a wrong resulting from a shameful piece of legislation understood by neither the people nor the legislature itself. No court, state or federal, would allow it to be the means of introducing covertly such consequences. When properly understood, I do not think it will lead to them.

But before discussing this point, it is proper to refer to the case of the First National Bank of Mount Pleasant *v.* Duncan, before Justice Strong, of the Supreme Court of the United States, and Judge McKennan, Circuit Judge, found in the Pittsburgh Legal Journal, June 12th 1878, p. 169. That case was decided, not upon an actual state of fact, but upon offers of evidence refused by the District Court. The offer was to prove that *many* banks of issue had been organized under the laws of the state, with power to charge such amount of interest as should be agreed upon between the bank and the borrower or customer. Of course the offer was to be taken as true, so that the decision rested not on an actual state of fact, but on one supposed *pro hæc vice*. In the case before us, we have no such assumed state of fact, but the simple question whether the charter of a single bank, or even of a few others, if any there be, with power to *agree* upon a rate of interest with the borrower, is such an alteration of the general bank law regulating

[First National Bank of Clarion *v.* Gruber.]

banks of issue, and of the general law of the state regulating interest, as will bring the case within the national bank act and allow all national banks to agree with their customers upon, and charge a rate of interest beyond the general rate of the state allowed to individuals and to banks of issue.   While I admit this to be a question for the federal judiciary, I think it will be long before its highest court will decide that so partial and anomalous a law, as the Franklin charter, will be sufficient to set aside the entire current of state legislation, and overturn its most cherished policy as to banks of issue, evidenced by all its legislation since the year 1813.   I think there are good reasons for this conclusion.

In the first clause of section 5197, Congress has expressed its great and ruling intent not to interfere with state policy and legislation as to its adopted rate of interest.   The second clause is but an *exception*, and is declared in the most definite language, and therefore is not to be carried beyond its expressly declared words, so as to conflict with the main general intent.   The language is "*except* that where by the *laws* of any state, a different *rate* is *limited* for *banks of issue* organized under state laws, the *rate* so *limited* shall be allowed for associations organized or existing in any such state under this title."   I have italicized the leading words of the exception to bring out its full meaning.   Thus, the language, "where by the *laws*, a different *rate* is *limited* for *banks of issue*," certainly is general and not particular.   It does not mean that where a particular person, or a particular bank is given a privilege, this privilege shall govern, but where the laws allow banks of issue as a class a different rate.   So the rate of interest is a *limited rate*.   Clearly, this cannot be said of that which is unlimited, which is no rate at all, but is a specific sum agreed upon by two parties.   The very fact that both the bank and the borrower must agree upon a sum, takes from the charge the character of a *limited rate*.   So far from its being a limited rate, it is not fixed at all—it has no limits but in the will of the parties. Clearly, it is not a "rate" but a *power* conferred to agree upon a compensation to be determined by themselves.   The state has conferred this power on certain citizens, but where has Congress conferred upon the national bank such a power to *agree* upon a rate with the customer ?   On the contrary, the Act of Congress confers no such power to *agree*, but expressly enacts that its creature can take only such *rate*, or standard, as the state law fixes as the *rate*, or standard for her own *banks of issue*.   To my mind it is perfectly clear that no such power to *agree* upon a rate, or particular compensation is conferred by Congress on the national banks.   Where the state allows her own banks of issue as a class the privilege of taking a higher rate of interest than is allowed by the general law, that rate may be adopted by the national banks.

[First National Bank of Clarion *v*. Gruber.]

These are some of the remarks of the learned justice who gave the opinion in Duncan's case, which must have been written from mere impressions without examination.   For example, that, until recently in Pennsylvania, state banks were always organized under special laws applicable solely to each bank—that no rate of interest was limited for banks as a class, &c.   The reverse is true.   The Act of 1814 divided the state into twenty-seven districts, and provided for the number of banks in each district, giving to each its name, and incorporating all upon one system, subject to the same general terms and provisions and fundamental articles, and provided for all the same rate of interest, viz., one-half of one per cent. for every thirty days (*vide* 12th fundamental article).   It was at that time, probably, the most complete and perfect system for bank charters in the United States.   These charters embraced all the then known banking institutions in the state, excepting one or two in Philadelphia which had been chartered before the year 1800, and limited them to the first of April 1825.   This limit brought into existence the Act of 1824, which was a general law repeating substantially the provisions of the Act of 1814, and its purpose was to recharter the banks incorporated in 1814 which then remained, many having failed in the interval of great depression which followed the close of the war.

The enumeration of banks in the first section will be found to contain many of the yet leading banks of this state.   I have examined all the acts of incorporation from 1824 to 1850, and find all are incorporated by reference to the Acts of 1814 and 1824, either in express terms or in general terms, which constitute those acts the fundamental provisions of their charters.   The same rule has prevailed as to special acts since 1850.   There are many special acts, but it is entirely inaccurate to say they were applicable solely to each bank.   On the contrary, all inhere in the same system, and are subject to the same rate of interest, made a fundamental article in the system.

It will be seen, therefore, that from this inaccuracy of recollection much of the learned justice's argument is without force.   In another particular it seems to me the opinion is not convincing, when it is asserted that to allow a state bank to take a greater rate of interest is injurious to the national bank system.   While uniformity in this respect is desirable, it seems to me the fact that national banks charge a less rate, is not injurious to them, certainly the tendency of the lesser rate is to draw the customers of banks to them, and not to send them away.   If there be anything in competition it is to draw custom to the lower charges.   True a higher rate will make more money when such rate is paid, but the question is upon the effect of the rate on the national bank system; and certainly if all the national banks in a state are limited to six per cent., the effect will be either to draw custom from the state

[First National Bank of Clarion *v.* Gruber.]

banks charging a higher rate of interest, or to compel them to lower their rates to a common standard. On the other hand if it be argued that the national banks should be allowed to make as much as the state banks of issue it may be conceded, and that this is the precise intent of the Act of Congress. But Congress did not intend to place them on a vantage ground over the state banks. To say that all the national banks in a state can adopt an *exceptional* rate allowed to a single bank in a state, or even two or three, is to place them above the state banks as a class, and contrary to the main intent of 5197th section. Clearly Congress did not intend to injure the state banks as a class. It is hard enough to be almost taxed out of existence purposely, as conceded by Justice STRONG, in Tiffany *v.* National Bank, 18 Wall. 413. Taxing out of existence was the very argument used by Chief Justice Marshall against the state power of taxation of federal institutions, in McCullough *v.* State of Maryland, 4 Wheaton 316. Neither is a fair exercise of the power. It is not a question of comparative merits between the state and national banks, or of usury or non-usury laws. These are not judicial questions. State judges are bound by her laws, and United States judges should have no desire to interpret federal laws unjustly. The true question is, what did Congress intend in the 5197th section and its predecessor, the act of 1864? Fair dealing requires that no advantage should be given to either state or national banks as a class. This section adopted the state rate of interest as the *law*, and made the *exception* depend on the rate of interest allowed by the state to her own banks of issue.

So, also, we should maintain our own consistency. The rate of interest for banks of issue was fixed by the Act of 1850. The public, the bar and the courts have not suspected any other rate to prevail, or other banks to be banks of issue to exist. We decide upon the true character of our own state institutions, whose powers cannot be extended by the decisions of other courts.

I think the judgment should be affirmed on this question. It was the principal question discussed in the argument, and was considered in consultation. But the opinion of the court being now on other grounds, in which I concur, this opinion will be filed as a concurring opinion.