# Fox's Appeal.

# In re Assigned Estate of Kutztown Savings Bank.

1. The Act of April 16th 1850, and the other statutes regulating distribution of the assets of insolvent banks and establishing an order of preference to creditors, do not embrace savings institutions, or banks so called, which are prohibited from exercising banking privileges.

2. The charter of a bank provided that for the security of depositors, a certain capital should be raised previous to the grant of letters of incorporation, "which capital shall at all times be liable to the depositors for the amount of their deposits." The bank made an assignment for the benefit of its creditors and in the distribution of its assets, *Held*, that this capital was designed to constitute a fund to be employed by the trustees for any of the legitimate purposes of the association; that it was not intended to be a special fund, separate and distinct from other funds, and for the exclusive benefit of depositors. *Held, further*, that said capital could not have been withdrawn by or refunded to those by whom it was subscribed.

[Fox's Appeal.]

March 4th 1880.   Before SHARSWOOD, C. J., GORDON, PAX-
SON, TRUNKEY and STERRETT, JJ.   MERCUR and GREEN, JJ.,
absent.

Appeal from the Court of Common Pleas, of *Berks county:* Of
January Term 1880, No. 241.

Appeal of Reuben M. Fox and Benneville Fenstenmacher, two
of the depositors in the Kutztown Savings Bank, from the decree
of the court confirming the report of the auditor to distribute the
assets of said bank in the hands of its assignee for the benefit of
creditors.

The facts as found by the auditor, F. R. Schell, Esq., were as
follows:

" The Kutztown Savings Bank, located in the borough of Kutz-
town, Berks county, Pennsylvania, was incorporated by the Gene-
ral Assembly of the Commonwealth, March 12th 1869, Pamph. L.
1869, p. 365.   The business of the corporation as specified in the
charter was, to receive upon deposit, from time to time, such sums
of money, not less than ten cents, as may be offered by tradesmen,
clerks, mechanics, laborers, servants, minors, married women and
others.   For the security of these depositors it was made by sect.
6th of this charter, the duty of the first trustees of the bank, pre-
vious to the grant of the letters patent, ' to raise and form a capi-
tal of not less than $5 nor more than $50,000, in shares of $20
each,' which capital was at all times to be liable to the depositors.
The capital stock of this bank was divided into twelve thousand
shares of the par value of $20 per share, payable in four equal
instalments.

" On the 20th of March 1869, the commissioners named in the
charter met for the first time, the subscription list was opened and
all but ten shares of the capital stock was subscribed.   On the same
day a permanent organization was effected by the election of a
president, vice-president, secretary, cashier and a board of trustees.

" On April 13th 1869, the first instalment due upon each share of
stock subscribed was called in by resolution of the board of direc-
tors, and on the same day the bank was opened for business.   The
bank then continued business, although in the meantime many and
serious losses had been sustained, with more or less embarrass-
ment, until the year 1873, when to meet drafts upon deposits, cer-
tain officers of the bank gave their individual notes as an accom-
modation, which notes were discounted and the proceeds placed to
the credit of the Kutztown Savings Bank.   In the minute book
of this bank on page 45, is found the following entry, to wit:
'Approved December 6th 1873, by the board.   On motion resolved,
that the notes signed by L. Wesley for $2500, R. J. Knerr for
$1500, M. S. Richards for $100, Daniel Clader for $3300, John
H. Fogel for $2200, are to be paid by the Kutztown Savings
Bank.   Adopted December 6th 1873.   Milton S. Richards, secre-

[Fox's Appeal.]

tary.' Also in the same book on page 56, is found the following entry, to wit: 'Kutztown, Pennsylvania, November 10th 1876. On motion resolved, that the notes amounting to $7000, that have been discounted by the Union National Bank of the city of New York, on October 31st 1876, last, signed by Daniel Zimmerman, president, and attested by W. C. Dietrich, cashier, and endorsed by R. J. Knerr, John H. Fogel, Daniel Dietrich and A. J. Fogel, be and (are) hereby ratified by the board of trustees, and to be paid by the Kutztown Savings Bank, when due. Said notes of $3000 and $4000 ($7000) were credited to the National Bank of Kutztown, by the Union National Bank of the city of New York, less the discount. On motion, adjourned. A. J. FOGEL, secretary.'

" On November 20th 1876, the cashier of this bank committed suicide. It was then discovered, that the institution was hopelessly insolvent, and it was determined to wind it up as speedily as possible. On the 15th day of December 1876, at a meeting of the board of directors, a resolution was offered and unanimously adopted, " That the president of the board of directors be instructed to execute and deliver, under the corporate seal of said bank, an assignment of all its effects and property, claims and demands, to James H. Marx, Esq., in trust for the benefit of the creditors of said corporation.' At a meeting of the stockholders of the bank held subsequently the same day, a resolution was offered and unanimously adopted, ' That the president of the board of directors be directed to execute and deliver, under the corporate seal of said bank, an assignment of all its effects and property, claims and demands, to James H. Marx, Esq., in trust for the benefit of the creditors of said corporation.' In pursuance of these resolutions, an assignment in due form of law was made on the 19th of December 1876, by the Kutztown Savings Bank to said James H. Marx, in trust for the benefit of its creditors. At the date of the assignment, although the four instalments due upon the capital stock had been regularly called in, but a little more than the amount of the first instalment of $5 per share had been paid. This amount was exhausted soon after the inception of the institution.

Upon these facts the auditor reported, inter alia, as follows :—

" We now come to the question of distribution. It was claimed before the auditor that the depositors were entitled to the entire fund for distribution, to the exclusion of all other creditors ; because,

" 1. The charter of the Kutztown Savings Bank was subject to the provisions of the General Banking Act of the state, approved April 16th 1850, Pamph. L. 1850, 447, in which act certain preferences are created by law.

" 2. That even if the charter of this bank were not subject to the provisions of that act, yet the depositors were entitled to a prefer-

ence in the distribution of the fund, by virtue of the sixth section of the charter of the bank.

"A careful examination of the charter of the Kutztown Savings Bank will show that the first point made in behalf of the depositors cannot be sustained. To arrive at a satisfactory conclusion on this point, the general banking laws of the state, as well as the charters of many savings banks, have been examined with great care by the auditor. The 39th section of the Act of 16th April 1850, which specifies the order in which the assignees shall pay the debts and liabilities out of the assets of a bank in case of an assignment, is a transcript of the 9th section of the Act of April 27th 1844, entitled 'An act to extend the charter of the Commercial Bank of Pennsylvania,' Pamph. L. 1844, pl. 420. Both the Acts of 1844 and 1850 contemplated a bank of issue or circulation, as contradistinguished from a bank of discount or deposit. Every section of the Act of 1850 shows clearly that a bank of issue was in the legislative mind at the time of the adoption of the act. So we see that the main purpose of the 9th section of the Act of 1844 and of the 39th section of the Act of 1850 was to secure the noteholders of any bank of issue against loss, for it has always been the policy of the law to protect this class of creditors. Their interests have always been zealously guarded by the legislature. It is also clear that the words, 'every banking corporation,' and 'the said bank,' as used in the Act of 1850, refer simply to a bank of issue. Now observe the peculiar language of the second proviso of the first section of the Kutztown Savings Bank charter. It reads, 'That nothing in this act contained shall be so construed as to confer upon the said corporation banking privileges.' Such a corporation as this—a corporation clothed simply with the power of receiving deposits, but by the express terms of its charter denied banking privileges—cannot, in any just sense, be said to be within the proviso of the Act of 1850. 'It may well be doubted whether raising money on deposit is exclusively a banking privilege,' said Judge SHARSWOOD, in Building Association v. Secmiller, 11 Casey 227 n. Attention may here be called to some of the points in which the charter differs radically from the Act of 1850. In the latter, the par value of the shares is fixed at $50; in the charter at $20 per share; in the latter letters patent are to issue after acceptance filed; the charter does not require this to be done; by the latter all charters expire in fifteen years from date; the charter is not to expire until twenty years after its enactment; by the act real estate may be owned to an amount not exceeding the whole capital stock; by the charter only such as is necessary for the business or such as may be necessary to secure debts can be held; by the act, thirteen directors are to be chosen annually; the charter provides for nine trustees who hold their offices until death, resignation or removal; by the act elections are provided for annually; by the

charter only when vacancies occur; by the act dividends are to be made twice a year; by the charter when the trustees 'deem it proper;' by the act bills of credit are to be issued; by the charter such bills are prohibited; by the act demand must be made in gold and silver and payment refused; by the charter only $25 can be demanded on any one day unless written notice be given ten judicial days before; by the act the stockholders are individually liable to pay certain creditors; by the charter there is no individual liability imposed; by the act the officers are to report to the auditor-general; by the charter the trustees report to the legislature; by the act the directors give no security; by the charter the trustees are required to give it. Again, if the Act of 1850 was meant to apply to a corporation of this kind, then the Act of April 22d 1854 sect. 4, Pamph. L. 468, which declared that 'all general laws relative to cashiers of banks shall be deemed and held applicable to the cashiers or treasurers of savings institutions,' was unnecessary and absurd. Equally useless also then was the first section of the Act of 1856, Pamph. L. 468, extending the third section of the Act of April 16th 1850, 'to all incorporated banking, saving fund, trust and insurance companies.' Reference may also be made here to the charter of the 'Coopersburg Savings Institution,' Pamph. L. 1867, pl. 1194, of which the charter of the Kutztown Savings Bank granted two years subsequently is almost a literal transcript. An additional, though wholly immaterial section (the tenth) so far as this question goes, was added to the charter of the Kutztown Savings Bank. With this slight difference the two charters are precisely alike, with the exception of the second proviso in the first section of the Kutztown Savings Bank charter. That proviso, which declares that nothing contained in the charter 'shall be so construed as to confer upon the said corporation banking privileges,' does not appear in the charter of the 'Coopersburg Savings Institution.' The insertion, therefore, of that proviso in the charter of the Kutztown Savings Bank shows clearly that it was the intention of the legislature to incorporate an institution somewhat exceptional in its character. Again, section eighth of our charter says: 'The said corporation shall be subject to the supervision and control of the Court of Common Pleas of Berks county and the Supreme Court of Pennsylvania, according to the provisions of the Constitution of this Commonwealth conferring equity jurisdiction upon the said courts.' It will be observed that this section is silent as to the Act of 1850 and all other general laws relating to banks. Not so, however, with the charters of some other banks which have been examined. Thus the Farmers' and Mechanics' Bank of Shippensburg, was incorporated as a bank of discount and deposit by the Act of April 11th 1862, Pamph. L. 1863, p. 661. In section eighth of that charter it is provided, 'that the said bank shall be subject to the provisions and restrictions of

the several acts regulating banks as far as they are applicable thereto.' The construction of this section of that charter came before the Supreme Court in Means's Appeal, 4 Norris 75. In that case Mr. Justice MERCUR, after stating that the Act of 15th April 1850, prescribes a general system for the creation, government and liquidation of banks, says of the eighth section just cited: ' Thus it appears the special act did not profess to furnish by itself a complete system for the bank thereby created. It provided for the organization, but when established it declared the corporation subject to previous legislation relating to banks. This special act was thus blended with the general acts. They became a part of its charter. They are in *pari materia* with the special act.' May we not argue from this case that a similar provision to the eighth section should have been inserted in our charter to make it subject to the General Act of 1850 ?

" The second point advanced by the depositors may next be considered. As stated before, at the date of the assignment, an amount exceeding $5000 had been paid in on account of the stock subscribed. Since the assignment the assignee has received from stock subscriptions (exclusive of the Knerr instalments, paid by certificates on deposit), the sum of $1152. From the other assets of the bank, such as notes, he has received some $4000, which with the Knerr certificate excluded, would make in all some $5200. After deducting all expenses, including the cost of holding the audit, a balance of $4000.38 remains in the hands of the assignee for distribution among creditors who shall be found to be legally entitled to the same. This entire balance was claimed by the depositors, to the exclusion of all other creditors, by virtue of the sixth section of the charter of this bank. Objection was made to such claim by other creditors, who contended that the fund should be distributed pro rata among all the creditors. And that, if this last point were considered unsound, the most the auditor could do would be to report two schedules of distribution, to wit: the one giving the $1152 (less share of costs) to the depositors only, and the other distributing the balance pro rata among all the creditors. The question thus raised may be examined by discussing

" First. The deed of assignment.

" Second. The charter of the bank.

" 1. The deed of assignment consists of two principal points: A transfer to the assignee which vests in him the property, and an express trust which directs how to dispose of it: Burrell on Assignments 156, sect. 127. The clause in the deed defining the trust is as follows: ' In trust, however, and to the intent and purpose that the said James H. Marx shall and do, as soon as convenient sell and dispose of the goods and chattels of it, the Kutztown Savings Bank, and collect and recover all the outstanding claims and debts, instalments and assessments to it, the said Kutztown Savings

[Fox's Appeal.]

Bank due, and with the moneys arising therefrom after deducting the reasonable costs and charges of him, the said James H. Marx, shall and do pay the creditors of the Kutztown Savings Bank their respective just demands in full; if there shall be sufficient the whole, and if there shall not be sufficient assets to satisfy the whole of the just demands of the creditors in full, then to pay the same according to the law in such case made and provided.' This assignment divests the bank of its entire interest and estate in the property assigned, and at once creates the relation of trustee and *cestui que trustent* between the assignee and the creditors. In this state an assignment duly recorded is regarded as a transfer by law of the property assigned. The Act of 1836 gives to the creditors the right to have the trust expressed in the deed executed for their benefit. Every part of the assignment must be considered in construing it, and the intent of the parties as found expressed in its terms must be carried out by the courts, unless such intent is inconsistent with recognised rules of law: Darling *v.* Rogers, 22 Wend. 483–488.

" The deed of assignment contains no clause giving a preference to any particular creditor or class of creditors. And had such a clause been inserted it would have been a nullity, for the Act of 17th April 1843, Pamph. L. 273, declares that ' all assignments of property in trust hereafter made to prefer one or more creditors shall be held and construed to enure to the benefit of all the creditors in proportion to their respective demands.' Under this act, which virtually becomes part of every assignment, it has been held that the deed containing preferences is not void but is construed according to the provisions of the act: Law *v.* Mills, 6 Harris 185; Wiener *v.* Davis, Id. 331. Did the trustees, then, of this bank exceed their powers in making this deed of assignment, or did they comply strictly with the law in declaring this trust? A citation of a few authorities will show clearly that they acted within the scope of the power vested in them. In Burton's Appeal, 7 P. F. Smith 218, it is said: ' The right of alienation is an incident of ownership and belongs to a corporation as well as to an individual when no restraint is imposed in the charter. This right is not restrained by any state policy. On the other hand, free and unrestrained commerce in property, real and personal, has always been regarded as a favorite doctrine.' Again, in Ardesco Oil Co. *v.* North American Oil and Mining Co., 16 P. F. Smith 375, Judge SHARSWOOD says: ' Corporations, unless expressly restrained by the act which establishes them or some other Act of Assembly, have and always have had an unlimited power over their respective properties, and may alienate and dispose of the same as fully as any individual may do in respect to his own property. Hence an insolvent corporation may make a general assignment for the benefit of its creditors, and this power may be exercised by the directors

unless special provision to the contrary is made in the charter.'    A corporation like an individual has power to assign its effects in trust to pay its debts.    This is a common-law right: Dana *v.* United States Bank, 5 W. & S. 223.    The trustees of the Kutztown Savings Bank have exercised a common-law right in alienating the property of the corporation in trust for all its creditors without preference.    It has exercised that right in strict compliance with the Act of 17th April 1843.    There is no other act bearing on the construction to be given to deeds of assignment.

"No act can be found providing that deeds of general assignment shall be construed 'to enure to the benefit' of any particular class of creditors of a corporation such as this.    This deed of assignment is, therefore, good and valid, and its terms must be observed in distributing the fund in the hands of the assignee, unless some limitation or restriction upon the power of alienation is contained in the charter.    This brings us to the second point, the consideration of the charter itself.

" 2.  Does the charter of the Kutztown Savings Bank impose any limitation or restriction upon the right of the trustees to alienate its property in trust for the benefit of all its creditors ?    Does that charter anywhere expressly declare that in the event of a voluntary assignment the depositors shall be preferred in the distribution of the assets ?    The section of the charter upon which the claim of the depositors was based is the 6th section, which reads as follows : 'That for the security of the depositors of the said institution, it shall be the duty of the persons named in the 1st section, and such others as may become members of the institution previous to the granting letters of incorporation, to raise and form a capital of not less than $5 nor more than $50,000, in shares of $20 each, which capital shall at all times be liable to the depositors for the amount of their deposit and the interest accruing thereon, the shares to be transferable on the books of the institution in such manner as may be designated by the by-laws of the institution.'    There is nothing in that section expressly imposing any limitation upon the right of the trustees to alienate the corporate property in trust for the benefit of all the creditors. Neither is there anything which expressly declares that in the event of such alienation in trust depositors shall be first paid to the exclusion of other creditors.    It is true the section says that this capital shall be raised for the security of the depositors and shall at all times be liable to them.    It does not say, however, that it shall be liable to no other creditors.    It is at best an additional but not exclusive security for depositors.    Preferences are not favored in the case of voluntary assignments, and any one claiming such preference must show clearly that he falls within some exception to the general rule.    In this case the claim of the depositors rests solely upon an implication.

[Fox's Appeal.]

"That is not sufficient, for where a statute confers exclusive privileges upon any class of persons, it is in derogation of common right, and should receive a strict construction. In the light of a strict construction, the claim of the depositors could not stand for a single moment. Had it been the intention of the legislature to place this class of creditors before all others, some such provision as that found in the 39th section of the Act of 1850 would have been inserted in this charter, for it cannot be doubted that in the legislative mind an express provision was required to effect that result. This is shown by the 9th section of the Act of 1850. The law-making powers in granting this charter were presumed to know that it did not come within the purview of the Act of 16th April 1850. They were also presumed to be familiar with all general laws relating to voluntary assignments. With such knowledge upon their part, the absence from this charter of a provision which had been previously inserted in all general laws creating preferences in favor of depositors, is a fact of some significance.

"Again, it cannot be urged that this assignment was inequitable. It has been well said by Chief Justice Buchanan in the case of State of Maryland *v.* Bank -of Maryland, 6 Gill & Johns. 216, 'Equality is equity; and when a debtor makes a transfer of his property for the purpose of equal distribution among his creditors, he does an honest act and discharges a moral duty which none can reasonably complain of.' "

The auditor then made distribution among all the creditors pro rata.

Exceptions were filed to this report, which the court dismissed in a brief opinion by Sassaman, A. L. J., adopting the reasons of the auditor.

From this decree this appeal was taken, the appellants alleging that the court erred in not distributing the entire fund to the depositors of the bank, to the exclusion of the other creditors who are not depositors, and in not distributing to the depositors exclusively that portion of the fund raised from sales of the stock of the bank.

*Jeff Snyder* and *George F. Baer*, for appellants.—The Acts of April 16th 1850, March 31st 1860, the supplement to the latter act, passed in 1861, and the Act of May 18th 1876, all make depositors preferred creditors.

These acts unmistakably fix the degree of care which the legislature conceives to be due to the several classes of creditors, which our banking institutions may have. In the light of these statutes, and the 6th section of the Kutztown Savings Bank charter, which provides, that for the security of the depositors a capital shall be raised, which capital shall at all times be liable to the depositors for the

amount of their deposits, is not the conclusion irresistible, that the legislature meant by this provision, to secure the depositors before all other creditors?

But we maintain, that the legislature has established a general rule for the distribution of assets of insolvent banks in the Act of the 26th of April 1844, Pamph. L. 1844, p. 419, which is applicable to this case: Pennsylvania Bank's Assignee's Account, 3 Wright 103; Parkesburg's Bank's Appeal, 6 W. N. C. 394.

If, however, we are in error, and our depositors are not preferred by virtue of the general legislation on the subject, we claim that the 6th section of the charter makes the capital liable to us primarily.

*Edward Harvey* and *H. H. Schwartz*, for appellees.—The Kutztown Savings Bank was incorporated by the special Act of March 12th 1869, Pamph. L. 365. Although it is in that act styled a " Savings Bank,' it is expressly prohibited from exercising " banking privileges."

The Act of 1850 provided a system of banking. All its provisions are referrible either to the organization or winding up of banks of issue: First National Bank of Clarion v. Gruber, 6 Norris 468. The 6th section is no more than a provision, that the capital stock is a fund for the payment of debts: Wood v. Dummer, 3 Mason 308; Mann v. Pentz, 3 Comst. 422. The unpaid subscriptions to its stock are a part of the assets of the corporation, and pass by a general assignment for the benefit of creditors: Germantown Passenger Railway Co. v. Fitler, 10 P. F. Smith 124; West Chester and Philadelphia Railroad Co. v. Thomas, 2 Phila. 344. Those that were paid before the assignment, were paid, not as a loan that the stockholders could reclaim, but as a part of the funds of the bank, and while there, were liable to be drawn by depositors. Again, the section provides for the payment of the whole subscription " previous to the granting of letters of incorporation." Nowhere in the act is it specified, that unpaid instalments shall be collectible by depositors.

The Act of April 17th 1843, Pamph. L. 273, provided, that all preferences in assignments should be void, and the funds distributed equally among the creditors, as if no such preference had been expressed. Just such an assignment the savings bank made, and in the absence of statutory prohibition, the auditor felt bound by it and observed its conditions in making the distribution.

Mr. Justice STERRETT delivered the opinion of the court, March 30th 1880.

The charter of the Kutztown Savings Bank, granted by the legislature in 1869, declares, " That the business of the corporation shall be, to receive on deposit, from time to time, such sums of

money, not less than ten cents, as may be offered by tradesmen, clerks, mechanics, laborers, servants, minors, married women and others, and to invest the same in the stocks of this Commonwealth or of the United States, or in the stocks or bonds of any city authorized to be issued by any Act of this Commonwealth, or in other stocks, or in bonds and mortgages, and other improved and valid securities; the said corporation shall receive all sums of current money offered as aforesaid, and shall invest the same in the manner aforesaid." Although styled a bank in the charter, it is expressly provided that nothing therein contained " shall be so construed as to confer upon the said corporation banking privileges :" Pamph. L. 365.

After being in operation for about seven years, the institution became insolvent, and pursuant to resolutions of its stockholders and board of trustees a voluntary assignment, in the usual form, was executed, in trust for the benefit of its creditors.   The fund for distribution represents part of the assigned estate, including a portion of the capital which had been subscribed, but not paid at the time of the assignment, and the whole fund is insufficient to pay depositors in full.

The assignments of error involve only two propositions : 1. That the appellants and other depositors constitute a preferred class, and as such are entitled to the whole fund, to the exclusion of all other creditors ;  2. If not entitled to the entire fund, they have an exclusive right to that portion of it which represents capital collected by the assignee.   In support of the first, it is contended, that the corporation was subject to the provisions of the Act of April 16th 1850, Pamph. L. 477, and other statutes regulating distribution of the assets of insolvent banks and establishing an order of preference ; first, to note holders, second to depositors, and third, to all other creditors except stockholders.   The learned auditor examined with great care the several Acts of Assembly on this subject, and came to the conclusion that they do not embrace savings institutions or banks, so called, which are prohibited from exercising banking privileges.   In this we think he was clearly right.   The Act of 1850, entitled an act regulating banks, established a complete system for the organization and winding up the affairs of banks in this Commonwealth.   It provides, among other things, for division of the capital stock, the manner of taking subscriptions, the issuing of letters patent, acceptance of charter, election of directors, issuing notes, assignment for the benefit of creditors, individual liability of stockholders, keeping notes at par in Philadelphia and Pittsburgh, and other matters peculiar to banks of issue and discount, and not applicable to banks of deposit only. The Act of April 26th 1844 also relates to the same class of banks.   Indeed, it is evident from the first preference given to note holders as a class that the legislation relied on by the appel-

[Fox's Appeal.]

lants, relates exclusively to banks of issue and discount, and was not intended to embrace such institutions as the Kutztown Savings Bank.

The second proposition is based on the 5th section of the charter, which provides that for the security of depositors a capital of not less than $5 nor more than $50,000, in shares of $20 each, shall be raised previous to granting letters of incorporation; "which capital shall at all times be liable to the depositors for the amount of their deposits and the interest accruing thereon." The capital, small as is the minimum thus required to be raised as a condition precedent to the issuance of letters patent, was evidently intended as a security for depositors, but not for them exclusively.    It was designed to constitute a fund to be employed by the trustees for any of the legitimate purposes of the corporation.    It might be loaned, or invested in property required for the use of the institution in conducting its business, or used in paying its creditors.    There is nothing in the charter to indicate that it was intended to be a special fund, separate and distinct from other funds of the institution and for the exclusive benefit of depositors; but it could not be withdrawn by or refunded to those by whom it was subscribed.    The capital stock of a corporation is a trust-fund for the payment of its debts: Wood *v.* Dummer, 3 Mason 308; Mann *v.* Pentz, 3 Coms. 422; and unpaid subscriptions to its stock are a part of its assets, which pass to the assignee under a general assignment for the benefit of creditors: Railroad Co. *v.* Thomas, 2 Phila. Rep. 344.    They are unlike those shares of stock which, for the special benefit of depositors, are sometimes made assessable to double the amount of the capital.    We think that the depositors, as a class, had no exclusive right to the whole or any particular portion of the fund.    All the property and effects of the corporation passed, under the assignment, to the trustee, subject to the ordinary rules of distribution pertaining to general assignments for the benefit of creditors.    The distribution was correctly made on this basis.

Decree affirmed, and appeal dismissed at the costs of the appellants.