# Schober *versus* The Accommodation Saving Fund and Loan Association.

A loan by a saving fund society, incorporated under the Act of 22d April 1850, to one of its members, for which security is given, deducting the premium agreed upon for the sum advanced, is not a *discount* within the prohibition of the 25th section of the first article of the constitution.

A member who has assigned his shares of stock in the association to a third party as collateral security for a debt, cannot, when sued upon his mortgage to the association, claim a credit for the value of such shares of stock.

ERROR to the District Court of *Philadelphia*.

This was an action of *scire facias* by The Accommodation Saving Fund and Loan Association against Charles W. Schober, and terre tenants, upon a mortgage dated the 11th October 1855, conditioned for the payment of $2600 within one year from the date thereof, together with lawful interest for the same, payable monthly, on the first Thursday of each and every month thereafter; and also for the payment of the sum of $26, on the first Thursday of each and every month thereafter, as and for the monthly contribution on thirteen shares of the capital stock of the said association, owned by the said C. W. Schober.

At the time of the execution of the mortgage, Schober was the owner of thirteen shares of stock in The Accommodation Saving Fund and Loan Association, and gave it to secure an advance to him of $200 upon each of his shares of stock, for which he had bid a premium of twenty per cent., or $40 on each share. He actually received from the association the sum of $2080, for which he gave

the mortgage in question, and also assigned to the association his thirteen shares of stock as collateral security.

The association was incorporated by the Court of Common Pleas of Philadelphia county, on the 6th March 1854, under the provisions of the Act of 22d April 1850. Schober became a member by subscribing to thirteen shares of its capital stock; on which he paid instalments to the amount of $1170, and as interest $351.

On the 3d May 1858, Shober assigned his thirteen shares of stock to Lewis T. Fackler (subject to the prior transfer to the association), in consideration of the payment by Fackler of Schober's note for $1400, held by the association.

The defendant pleaded *non est factum;* satisfaction; set-off; payment with leave; and the following special plea:—

"And for a further plea in this behalf, the said defendant, by leave of the court, here for this purpose first had and obtained, according to the form of the statute in such case made and provided, says, that he ought not to be charged with the said debt, by virtue of the said indenture of mortgage or otherwise, in the said *scire facias* mentioned, because he says, that before and at the time of the making and entering into the said indenture of mortgage and bond, and after the passing of a certain Act of Assembly of this Commonwealth, passed the 1st day of June, A. D. 1839, entitled 'An act to prescribe the manner of giving notice of application for banks,' to wit, on the eleventh day of October, in the year of our Lord one thousand eight hundred and fifty-five, at Philadelphia, in the county aforesaid, the said plaintiff, acting as a body corporate, loaned or advanced to the said defendant the sum of two thousand and eighty dollars, for which loan or advance the said defendant executed and delivered to the said plaintiff his said bond and mortgage, conditioned for the payment of the just sum of two thousand six hundred dollars, payable within one year from the date thereof, the said defendant being a member of the said corporation, and having bid or offered the said deduction or difference between the said sum of twenty-six hundred dollars and the said sum of two thousand and eighty dollars, as a premium for the said loan to the said plaintiff, whereby the said bond and the said indenture of mortgage in the said *scire facias* mentioned, were and was and each of them was discounted by the said plaintiff, and that the said indenture of mortgage and the said accompanying bond were and are and each of them was and is wholly void in law: and this the said defendant is ready to verify. Wherefore he prays judgment if he ought to be charged with the said debt, by virtue of the said indenture of mortgage and accompanying bond."

To this special plea the plaintiffs demurred; and the court below, on the authority of the case of The Building Association

[Schober *v.* The Accommodation Saving Fund and Loan Association.]

*v.* Seemiller, 15 *Leg. Int.* 132, in the same court,* gave judgment for the plaintiffs on the demurrer.

On the trial, the defendant excepted to the admission in evidence of the transfer of the shares of stock to Fackler, and

* In the case of The Building Association *v.* Seemiller, the following opinion was delivered by SHARSWOOD, P. J.:—

"By an Act of Assembly passed April 22d 1850, the Courts of Common Pleas of certain counties were authorized to grant charters of incorporation to persons who had associated, or meant to associate, for the purpose of forming 'mutual savings fund, land, and building associations.' The objects and purposes of such associations are not stated in the act, nor are their powers enumerated or described; the name is all that we have to guide us. The legislature appears to have assumed that the nature of such societies was well known. It is provided by the 7th section, 'that in investing the fund or funds of said mutual savings fund associations, corporations, or bodies politic in law, preferences shall be given to the members thereof in such manner and under such conditions and regulations as they may have agreed upon or may mutually agree upon.'

"Many corporations have been created in virtue of this law; and there have been many controversies growing out of their transactions, which have come before this court. The general purpose of these associations is, that the members, by the monthly payment of small instalments, may accumulate for themselves a sum sufficient to build or purchase a house. At every monthly meeting of the society they pay or send in their dues, and there is thus ascertained to be in the hands of the treasurer a certain fund. This fund is offered to the members for investment; whoever bids the highest sum for it obtains it, or such part of it as he desires, provided, that he cannot obtain more than the interest he will have in the association, when all the instalments are paid, or until the entire funds amount to the prescribed sum or capital.

"He is required to give real security for the payment of the loan, or rather it is in truth for the punctual payment of the dues and interest on the sum he has borrowed. He transfers his shares to the society as further collateral. If he has not been a borrower, whenever the fund amounts to the prescribed sum, he receives his proportion. If he has borrowed to the full amount, his debts and securities are cancelled. This appears from the depositions to have been the general principle upon which the affairs of the plaintiffs were conducted. They were an association incorporated under this act; the defendant was a member of the association. The plaintiffs having certain funds to invest, the defendant bid for a loan, and being the highest bidder it was awarded to him. He received $3164 and gave a mortgage of $5200, upon the bond and warrant accompanying which this judgment was entered.

"We are now asked to open this judgment, and let the defendant into a defence. The defence set up is, that the Act of 22d April is unconstitutional, or at all events that the corporations created under it have no power to loan out their money in the manner in which this loan was made, and that no recovery can be had on an illegal transaction. It is alleged on the part of the defendant, that this was the exercise of a discounting privilege, a privilege with which the corporation plaintiff are not invested by their charter, and that if the legislature intended to confer such a privilege, it was not in their power to do so without a compliance with the terms of section 25th, article 1st, of the amended constitution: "No corporate body shall be hereafter created, renewed, or extended, with banking or discounting privileges, without six months' previous public notice of the intended application for the same, in such manner as shall be prescribed by law.' By an Act of Assembly of 1st January 1839, the mode of giving this notice is prescribed.

"There is no express grant to the corporation, by the terms of the Act of

[Schober *v.* The Accommodation Saving Fund and Loan Association.]

claimed a credit for the amount paid thereon. The court instructed the jury to disallow the instalments paid on the stock, and to give a verdict for the sum originally loaned, with interest, crediting all that had been paid as interest; to which the defendant excepted.

1850, of any discounting privileges. There is the power of investing their funds, according to such by-laws as they may adopt; but it certainly cannot be pretended that this would vest them with a privilege which the legislature had no power to grant, except under certain restrictions.

"It is true, that by the Act of May 8th 1855, *P. L.* 519, it is enacted, "that in investments by building associations in loans to members thereof, the premium given for preference or priority of loan shall not be deemed usurious.' This act simply repeals the Act of March 1723, relative to usury, so far as regards these associations. It cannot be held to invest them with any discounting privilege, whatever meaning we may attach to that phrase. It cannot then be pretended on any reasonable ground, that the Act of 1850 is unconstitutional, or that the charter of plaintiffs is null and void. But the only question is, could the corporation exercise the power of investing their funds in the mode explained? Was it the exercise of a discounting privilege within the meaning of the constitution?

"I will assume, for the purpose of this argument, that if it was, the defendant can avail himself of it as a defence; a point which would require consideration, if the decision of the case turned upon it, and upon which the authorities are by no means unanimous. We are clearly of the opinion, that the investment of the funds of the plaintiff in the mode adopted in this case, was not the exercise of a discounting privilege within the meaning of the constitution.

"The word discount has, to be sure, in its literal sense, a meaning which would include this transaction. According to Dr. Johnson, to discount is to ' count back;' ' to pay back,' and a discount is the sum expended in a bargain. It would doubtless be good news to many corporations at the present day, to hear that they had not this power. The word has acquired, however, now a restricted meaning, at least in its legal and commercial use, that which is the appropriate sense to be applied to it in the constitution. This is well given or explained in *Postlewaite's Dictionary of Trade and Commerce, ad verbum* Discount, 'a term used among traders, merchants, and bankers; when by the two former, it is used sometimes on occasion of their buying commodities on the usual terms of credit, with a condition that the seller shall allow the buyer a certain discount, at the rate of so much per cent. per annum, for the time for which the credit is generally given, upon condition that the buyer pays ready money for such commodities, instead of taking the term of credit. Also, traders and merchants, frequently taking promissory notes for moneys due and payable to them or order, at a certain time, and sometimes having occasion for money before the time of payment; which discount is more or less, according to the credit and reputation of the person who drew the notes and the endorser or endorsers.' Dr. Webster has accordingly rejected the ancient literal sense as now obsolete, and says that a discount is 'among bankers the deduction of a sum for advanced payment, particularly the deduction of the interest on a sum lent at the time of lending.' The constitution connects together ' banking and discounting,' and it is evidently in the sense of bank discounts that the latter word is used. The whole discussion in the convention which framed the amendments in regard to the article, was directed to the evils and dangers of banking, and though in one of the propositions submitted, the words used were ' banking, discounting, or loaning,' yet in the clause as finally adopted the last word was left out. To construe the word in any other than its banking sense, would be to say, that no cor-

[Schober v. The Accommodation Saving Fund and Loan Association ]

There was a verdict and judgment for the plaintiffs for $2139.81; whereupon the defendant sued out this writ, and here assigned for error: 1. That the court erred in giving judgment for the plaintiffs on the demurrer: 2. That the court erred in admitting the evidence of the assignment of the shares of stock

poration, at least none incorporated since 1838, could make an investment in stocks, loans, or any species of security, having a par or nominal value, at less than such par value. This mercantile or banking sense of the word has been recognised repeatedly by the courts in their adjudications. 'It is notorious,' says Judge STORY, in Fleckner v. U. S. Bank, 8 Wheat. 338, 'that banking operations are always carried on in our country by discounting notes.' 'What is discount? Has it (the bank) not a right to take an evidence of the debt which arises from the loan? If it is to discount, must there not be some chose in action, or written evidence of a debt payable at a future time, which is to be the subject of the discount? Nothing can be clearer than that, by the language of the commercial world and the settled practice of banks, a discount by a bank means, ex vi termini, a deduction or drawback made upon its advance or loan of money, upon negotiable paper or other evidence of debt, payable at a future day, which are transferred to the bank. We must suppose that the legislature used the word in this, its appropriate sense.'

" There are other cases in which this sense of the word 'discount' has been referred to as the legal appropriate sense: Manhattan Company v. Osgood, 15 Johns. 162; Bank of Chenango v. Curtiss, 19 Johns. 326; Bank of Utica v. Wager, 2 Cowen 723: and I have accidentally met with one case in which the legislature seem to have given a similar construction to this clause of the constitution, by prohibiting the American Trust Company for the protection and advice of emigrants and the investment of funds, from investing or using money or other assets belonging to or intrusted to them in the purchase or discount of any bills of exchange, promissory notes, or other negotiable paper: Act of 21st May 1857, P. L. 640. By discount, in the constitution, I understand to be meant bank discounts; and a bank discount is the purchase of a promissory note, bill of exchange, or other negotiable paper at less than its face. This was the business aimed at by the constitution, not the investment of money by religious, literary, charitable, insurance, saving, mining, and other corporations, in stocks, loans, bonds, mortgages, and ground-rents at less than their par value. There are three species of banks known to the commercial world, but in this country these three kinds are generally consolidated into one, banks of deposit, of discount, and of circulation. These three functions are perfectly separate and distinct. Banks exercise many other functions, not exclusively banking, such as investments in public loans or stocks. Indeed, it may well be doubted, whether raising money upon deposit is exclusively a banking privilege. As this is exercised in this country, different entirely from the Bank of Amsterdam, which was formerly a bank of deposit, and as the Bank of Hamburg is at present, it is in effect a loan of money to the bank payable on demand in part or whole to suit the lender, without interest. It is very notorious that banks use in other branches of their business the money deposited with them by their customers. They discount on their deposits, they sometimes agree to pay interest on them. They are not deposits then in the strict sense of the word. The bank is not a mere depositary, but a debtor to the customer for the amount. It would not be discharged by robbery or other accident which would discharge a mere naked bailee. What then is this banking privilege, but the privilege of borrowing money to use in the borrower's business? Is this power withheld from every corporation, of whose act of incorporation notice was not given according to the constitution and law? I hardly think it will be pre-

[Schober *v.* The Accommodation Saving Fund and Loan Association.]

to Fackler. 3. That the court erred in charging the jury to disallow the instalments paid by the defendant on his stock.

*J. Wilson Wallace* and *Oehlschlager*, for the plaintiffs in error, cited Fleckner *v.* United States Bank, 8 *Wheat.* 338; Kupfert *v.* Guttenberg Building Association, 6 *Casey* 470; *Encyclopedia Americana*, vol. 1, page 543, tit. Bank; *Constitution of Pennsylvania*, art. 1, sect. 25.

*Heyer*, for the defendants in error, cited Thornton *v.* Bank of Washington, 3 *Pet.* 38; Fleckner *v.* United States Bank, 8 *Wheat.* 338; People *v.* Utica Insurance Co., 15 *Johns.* 358; Bank of Chenango *v.* Curtiss, 19 *Id.* 330; Bank of Utica *v.* Wager, 2 *Cowen* 712; Insurance Co. *v.* Ely, *Id.* 678; Insurance Co. *v.* Hunt, 1 *Wend.* 57; Insurance Co. *v.* Caldwell, 3 *Id.* 296; Insurance Co. *v.* Scott, 19 *Johns.* 1; Insurance Co. *v.* Ely, 5 *Conn.* 573; Beach *v.* Fulton Bank, 3 *Wend.* 574; Insurance Co. *v.* Insurance Co., 7 *Id.* 31.

The opinion of the court was delivered by
STRONG, J.—The case of the defendant below, now plaintiff in

tended. I conceive the meaning of the makers of the constitution was, to prohibit the functions of discount and circulation from being conferred on corporations without notice to the public. These are the functions which, united, not only enable these institutions to make great gains, but are of great public importance, as supplying an ordinary currency, and putting it in their power to expand or contract, and thus raise or depress prices at their pleasure. 'It is chiefly,' says Adam Smith, 1 *Wealth of Nations* 444, 'by discounting bills of exchange, that is by advancing money upon them before they are due, that the great part of banks and bankers issue their promissory notes. They deduct always upon whatever sums they advance the legal interest until the bill shall become due. The payment of the bill when it becomes due replaces to the bank the value of what had been advanced, together with a clear profit of the interest. The banker who advances to the merchant, whose bills he discounts, not gold and silver, but his own promissory notes, has the advantage of being able to discount to a greater amount by the whole value of his promissory notes, which he finds by experience are commonly in circulation. He is thereby enabled to make his clear gain of the interest in so much larger a sum.' Banks of deposit, so far from being injurious or dangerous, are in general beneficial and safe. They protect the gold and silver of the community from the danger of robbery and fire, as well as from loss by abrasion, and at the same time greatly facilitate the operations of commerce by the convenience of payment in checks instead of coin: *Raguet on Banking* 71.

"When joined with the power of discounting, and especially of putting forth bank notes, then it is that danger is to be apprehended from them, and most especially from their undue multiplication. Hence this clause of the constitution was adopted, that such institutions might not be sprung and fastened upon the community without due notice, and an opportunity offered to the citizens to present their protest and remonstrance to the legislature. To such privileges, therefore, the prohibition ought to be confined."

[Schober v. The Accommodation Saving Fund and Loan Association.]

error, is most dishonest and repulsive, but if it be legal, it must prevail.

His plea was, that the loan association was a body corporate; that it had loaned to him the sum of $2080, for which loan he had executed and delivered his bond and mortgage, conditioned for the payment of $2600 within one year; that he was a member of the corporation, and had bid or offered for said loan the difference between it and the sum of $2600 as a premium, whereby the bond and mortgage were discounted by the corporation, and therefore void.

The defence intended to be set up by the plea is, that such a loan as it describes is a " discount," within the meaning of the 25th section of article 1st of the amended constitution of 1838, and therefore that the plaintiffs below were not privileged to make it. The constitutional inhibition is as follows:—"No corporate body shall hereafter be created, renewed, or extended, with banking or discounting privileges, without six months' previous public notice of the intended application for the same, in such manner as shall be prescribed by law." On the 1st of June 1839, the legislature prescribed the manner of giving this notice. Though the plea does not make the averment, it is assumed that the plaintiffs below were incorporated since the 1st of June 1839, and that they were incorporated without having given six months' notice of their intended application for a charter.

Was then the transaction a discount within the meaning of the constitutional prohibition? For if it was not, the plea is bad. Then the loan was not illegal, and the bond and mortgage are not void.

Upon this question we can entertain no doubt. It is nothing to the purpose, that the word discount, among its many significations, has one which would include this transaction. The inquiry is, how was it understood by the framers of the constitution? Did they contemplate a prohibition of anything which had ever been called a discount, or which makes up any of the definitions of the word to be found in our dictionaries? Did they intend to prevent a corporation from selling any of its property, and throwing off a portion of the price for present payment? Yet such a transaction is discounting in one sense of the term. Did they intend to prevent a corporation from making a deduction from a sum due by a debtor in consideration of his paying the remainder before it became due? This, too, is in one sense discounting. It is too evident to admit of a doubt, that the constitutional provision had in view the banking or discounting which was customary at the time it was framed. The framers used the word discounting in its banking sense. It was then, as it is now, a well-known fact, that bank discounting in this country has always been conducted by the deduction of the interest at the time the money is loaned,

[Schober *v.* The Accommodation Saving Fund and Loan Association.]

and has been confined to dealing in promissory notes, bills of exchange, or other negotiable paper. It has always been the buying of bills of exchange, promissory notes, or negotiable paper for less than its face. It was such a business as that (it being usually coupled with the privilege of issuing notes as a circulating medium), that the constitution intended to restrain, by interposing obstacles to the creation of corporations, with power to engage in it. With such views of the meaning of the constitutional provision, we hold that there was no error in giving judgment against the defendant below upon the demurrer to his plea.

Nor are the other errors assigned to this record any better sustained, or any more creditable to the honesty of the plaintiff in error. They may be considered together, for they present the same question. Schober, besides the money obtained upon his bond and mortgage, was indebted to the loan association in the sum of $1400, for which they held his promissory note. This note was paid by Lewis F. Fackler, and in consideration thereof Schober transferred to him thirteen shares of stock, which he held in the association, upon which he had paid $1170. Fackler took it, subject to a previous assignment to the mortgagees, as a collateral security to the mortgage. The court below received the evidence of these facts, and instructed the jury to disallow the instalments paid by Schober on the stock, and to give a verdict for the sum originally advanced, with the interest, crediting all that had been paid as interest. The complaint now is, that the mortgagor was not allowed to have a credit on his mortgage for the $1170, paid by him to meet the instalments due upon his stock. In other words, after having transferred his stock for value received by him, he seeks to destroy it in the hands of his assignee. The case of Kupfert *v.* The Guttenberg Building Association will not sustain him in such an attempt. There the borrower had not severed his interest in his stock from application to the payment of his mortgage. Here he has done it by a solemn assignment over his hand and seal. It is not for him now to say that his stock should have been applied to the partial payment of his mortgage, when he had received its value in another way, and had given to it a different direction.

The judgment is affirmed.