# DeHaven, Appellant, *v.* Pratt.

*Banks and banking—Trust companies—Double liability of stockholders —Act of May* 11, 1874, *P. L.* 135, *and April* 29, 1874, *P. L.* 73.

1. The Act of May 11, 1874, P. L. 135, which imposes a double liability upon "all stockholders in banks, banking companies, saving fund institutions, trust companies, and all other incorporated companies doing the business of banks, or loaning and discounting moneys. as such in this Commonwealth," does not apply to trust companies incorporated under the general corporation act of April 29, 1874, and supplements thereto. The words "trust companies" as used in the act of May 11, 1874, apply only to such trust companies as were created by special acts passed prior to the adoption of the new constitution, and which were given the right to engage in a banking business.

2. The double liability of corporation stockholders does not exist unless imposed by statute, and statutes imposing such liability are strictly construed.

3. There is nothing in the Acts of May 24, 1881, P. L. 22, May 9, 1889, P. L. 159, or May 29, 1895, P. L. 127, which imposes a double liability on stockholders of trust companies incorporated under the Act of April 29, 1874, P. L. 73.

Argued Jan. 11, 1909. Appeal, No. 277, Jan. T., 1908, by plaintiff, from decree of C. P. No. 2, Phila. Co., Sept. T., 1907, No. 4,770, dismissing bill in equity in case of Alexander M. De-Haven, receiver of the Union Surety & Guaranty Company, v. Pascal P. Pratt et al. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity to enforce double liability of stockholders.

SULZBERGER, P. J., filed the following opinion:

The Union Surety & Guaranty Company being insolvent, the plaintiff, Alexander M. DeHaven, was appointed receiver, and he now brings his bill against the stockholders to charge them with double the par value of the stock, in addition to the original payment of its par value, on the ground that the fund so to be raised is needed for the payment of the company's debts. As authority for this additional assessment he relies on the Act

of Assembly of May 11, 1874, P. L. 135, entitled: "An Act fixing the liability of stockholders of banks and banking companies and other banking institutions in this commonwealth."

The main issue to be determined is raised by the third paragraph of the answer. This is in response to the sixth paragraph of the bill, which averred that the said Union Surety & Guaranty Company took money on deposit, subject to check, and conducted a surety, trust company and general banking business. The answer denied the conduct of a general banking business, but admitted that the company loaned its funds upon bonds and mortgages secured upon real estate in the city of Philadelphia, and upon collateral security as authorized by the acts of assembly under which it was incorporated, and that in connection with the collateral loans the said company required borrowers to execute an obligation authorizing the company, in the event of default, to dispose of the collateral, and averring that the company did not receive the interest due on any loans made by it in advance by way of discount, but received the interest only when and as it became due subsequent to the making of the loan.

This raises the issue whether the business admitted to have been transacted by the company is or is not banking, and on the determination of that issue depends the applicability of the act of May 11, 1874, to the company before us. There are, as usual, ancillary and supplemental contentions, among them the proposition of the plaintiff that, in any event, even if the company's business was not properly banking, its stockholders are nevertheless liable under the penal provisions of the act of May 11, 1874, because it was a trust company and, therefore, belonged to a class expressly named in the body of the act, though not named in the title.

Banks and trust companies are not identified with each other in the popular mind. Banks are ancient; trust companies modern. Banks deal primarily with merchants, trust companies with all classes without distinction. Banks lend on personal credit; trust companies on the security of pledged collaterals. Banks take the risk of the business success of mercantile enterprises, while trust companies incur only the risk of a decline

in investment values. Banks actively promote commerce, while trust companies manage investments.

What they have in common is that they both receive deposits which they put out at interest so that dividends of profits may be earned for the shareholders. Even in this respect there are important differences between the two. Normally, banks pay no interest on deposits; trust companies pay such interest. Banks, under the power of discount, are allowed by law to earn interest at a rate somewhat higher than six per cent; while trust companies are limited to the ordinary legal rate of six per cent.

The Union Surety & Guaranty Company was chartered perpetually on March 6, 1889, under the act of April 29, 1874, and the several supplements thereto, and the second paragraph of the certificate constituting its application for the charter was as follows: "Said corporation is formed for the purpose of insuring the owners of real estate, mortgages and others interested in real estate from loss by reason of defective titles, liens and incumbrances."

There are three supplements to this act of April 29, 1874, which are pertinent to this inquiry. The first was approved May 24, 1881, P. L. 22, and conferred upon title insurance companies many additional powers, and practically made their charters analogous to those of the well-known trust companies that had theretofore been incorporated by special acts. The first clause of the first section of this act of 1881 authorized them:

"First. To receive and hold on deposit, and in trust, and as security, estate real and personal, including the notes, bonds, obligations of states, individuals, companies and corporations, and the same to purchase, collect, adjust and settle, sell and dispose of, in any manner, without proceeding in law and equity, and for such price and on such terms as may be agreed on between them and parties contracting with them: Provided, That nothing herein contained shall authorize said companies to engage in the business of banking."

The supplement of May 9, 1889, P. L. 159, re-enacted this power in the same words, while the supplement of May 29, 1895,

P. L. 127, in an amendment of another section of the act of 1889, enacted as follows:

"Fourth. To act as assignees, receivers, guardians, executors, administrators, and to execute trusts of every description not inconsistent with the laws of this state or of the United States, and to receive deposits of moneys and other personal property and issue their obligations therefor, to invest their funds in and to purchase real and personal securities, and to loan money on real and personal securities."

The effect of this legislation was practically to vest in real estate title insurance companies, the same powers that had been conferred by special charters on trust companies.

On well-known principles of law, the liability of the defendants under the statute of May 11, 1874, must be clear before we can impose its penalties. Though the act may not in strictness be classed with penal statutes, its nature is analogous to theirs. In a community where limited liability corporations transact a great part of the business, we cannot presume that unlimited liability, or greatly extended liability, will be imposed in a few exceptional cases, save on grounds of public necessity or utility. When the legislative wisdom imposes such liability, it is the duty of the courts sternly to enforce it. We ought, however, to be well satisfied in each instance that the corporation sought to be charged is within the terms, or at least within the spirit and intent, of the statute.

In 1899, when the Union Surety & Guaranty Company, the corporation before us, was chartered, there was no general statute which by its title professed to incorporate trust companies. There was a general statute, the Act of May 13, 1876, P. L. 161, which provided for the incorporation of banks. The company in question was not incorporated under the latter act. It did not seek the banking privileges conferred by it, but desired privileges inhering in what are known as trust companies, and accordingly declared in its certificate that it was formed under the act of April 29, 1874, and the several supplements thereto, and that its purpose was "insuring the owners of real estate, mortgages, and others interested in real estate from loss by reason of defective titles, liens and incumbrances."

Of course, the certificate lacked fullness and even accuracy, but it slavishly followed the mere wording of the law. When the legislature, on April 29, 1874, enacted the statute "to provide for the incorporation and regulation of certain corporations," it had in mind an informal classification of its own, traceable in the legal history of the state since 1790.

The occasion for this classification is to be found in certain conditions which profoundly affected general opinion.

Prior to the bold action of the convention which framed the constitution of 1874, the legislature had the sovereign power of granting charters by special acts of assembly (subject, of course, to the veto of the governor). This power, in its origin and practice in England and in this country, inevitably became a means of favoring some in preference to others, and was later thought to degenerate into even worse forms of corruption. Agitation against the exercise of this power began early in the history of the commonwealth, it being contended that all citizens who conformed to certain requirements should have an equal opportunity to obtain corporate franchises and to exercise corporate rights. The result of this agitation was that, by ordinances to some extent self-denying, the legislature gradually conferred on the executive and the judicial departments of the government co-ordinate power to charter certain corporations, reserving to itself, of course, the right to exercise such power when it saw fit.

When the legislature began to yield some of its powers, it did so cautiously and slowly. Naturally, the corporations which had the most obvious claims to be relieved of unnecessary burthens became the first beneficiaries of the new practice.

As early as 1791, a general law was passed enabling the Supreme Court to incorporate societies for any literary, charitable or religious purpose (April 6, 1791, 3 Smith's Laws, 20), and this act became the forerunner of many similar statutes providing for the incorporation of societies which may be classed as charities in the broadest sense which the courts have given to that word. In 1836, the legislature selected another class for general incorporation: Act of June 16, 1836, P. L. 799. This act and those that followed it were made to include general busi-

ness corporations. In 1850, a new class of mutual business corporations was recognized.

During all this period down to 1860, the legislature jealously reserved to itself the right to incorporate banks. The first free banking law was approved on March 31, 1860, P. L. 459. It was entitled: "An Act to establish a system of free banking for Pennsylvania, and to secure the public from loss against insolvent banks," and was re-enacted in an improved form as a supplement on May 1, 1861, P. L. 503.

And the exclusive right to incorporate railroad companies was yielded still more slowly. The first free railroad law was passed on April 4, 1868, P. L. 62, and was entitled: "An Act to authorize the formation and regulation of railroad companies."

During all this long contest for equal rights to corporate franchises, it became clear that the object sought for had been but partially attained. With the growth of population, of capital and of industry, business enterprises assumed larger proportions, and outgrowing the power of individual wealth, their transfer to corporations with associated wealth became inevitable. This state of affairs begat a new group of legislative special charters with vast and complicated functions and powers, but dimly discerned by the legislators who granted them, and a new class of speculators in charters arose, who obtained from the legislative favor, special acts for the mere purpose of sale to customers when they should appear. Many of these acts made no explicit mention of the powers conferred by them, merely vesting in the new company formed, all the franchises and privileges of some previously incorporated company named in the act. The titles of such corporations very often had little significance, and it became the fashion to insert a clause authorizing the corporators to change the name at their pleasure.

The feeling grew stronger and stronger that the only remedy against the evils complained of was a curtailment of legislative power. Accordingly, the new constitution (art. III, sec. 7) forbade the general assembly to pass any special law creating corporations, or amending, renewing or extending the charters thereof, or to grant to any corporation, association or individuals, any special or exclusive privilege or immunity.

While this great movement for the equal right to incorporate progressed thus steadily, no statute for the general incorporation of trust companies was passed. Those in existence had been incorporated by special acts. The oldest of them, The Pennsylvania Company for Insurance on Lives and Granting Annuities, was incorporated in 1812, P. L. 94, as a life assurance and annuity company. By the seventh section of the charter it was,·"Provided, that no deposit, loan of money upon interest (except in such cases as may be authorized by this section), or promissory note shall be allowed, made or issued in the manner of a banking association."

By the second section of the supplement of April 8, 1829, P. L. 142, the aforesaid seventh section was repealed. It was not until February 26, 1836, however (P. L. 49), that the powers of a trust company were conferred on it. By the first section of this supplement, it was authorized "to accept and receive moneys, or other property, real or personal, in trust, to accumulate the interest or income thereof, at such rates and in such manner as may be agreed on, or to allow and pay such interest or income therefor or thereon as may be stipulated and agreed· on between the parties, not exceeding the legal rate of interest. And also to accept and execute trusts of any and every description, which may be committed or transferred with their consent to them, by any person or persons whatever, bodies corporate or politic, or by any court of the United States, or of the commonwealth of Pennsylvania."

A further supplement of April 6, 1870, P. L. 985, added (sec. 4) the power to receive moneys on deposit as fully as any other bank or trust company may.

And finally, the supplement of March 7, 1872, P. L. 234, authorized it additionally to become a safe deposit company, and (sec. 3) "to purchase, collect, receive, sell, assign and dispose of any and all manner of personal property: Provided, That nothing herein contained shall authorize it to engage in the business of banking."

The Girard Life Insurance, Annuity and Trust Company was incorporated on March 17, 1836, P. L. 99, with practically the same powers as the former company, and with the stipulation

(sec. 9) that, "this corporation shall issue no notes or bills of credit, or promissory notes in the nature of bank notes, or exercise any banking privileges whatever," and the other stipulation (sec. 2) "that nothing herein contained shall be construed so as to enable the said association to invest any portion of its funds in the discount of promissory notes or bills of exchange."

The Fidelity Insurance, Trust and Safe Deposit Company was incorporated on March 22, 1866, P. L. 278. It obtained the same full trust company powers to receive deposits, etc., as those already named, with the proviso (sec. 2) "that nothing herein contained shall authorize said company to engage in the business of banking."

It is needless to give further examples. Those already presented show, that in the legislative mind, the receiving of deposits and their loan on collaterals was not considered banking, or, at all events, had ceased so to be considered; that to the latter term a special and peculiar sense had attached; that before the establishment of the national banking system, the distinctive points of banking were the discounting of commercial paper and the issue of bank notes; that afterwards the latter feature was, for the time at least, eliminated, and that then the sole peculiar characteristic of a state bank was the discounting of commercial paper.

These general views of the effect of our banking statutes and the practice under them are sustained by the opinions of our courts.

In the case of Schober v. Saving Fund and Loan Association, 35 Pa. 223, Mr. Justice Strong said:

"It is nothing to the purpose, that the word discount, among its many significations, has one which would include this transaction. The inquiry is, how was it understood by the framers of the constitution? Did they contemplate a prohibition of anything which had ever been called discount, or which makes up any of the definitions of the word to be found in our dictionaries? Did they intend to prevent a corporation from selling any of its property, and throwing off a portion of the price for present payment? Yet such a transaction is discounting in one sense of the term. Did they intend to prevent a corporation

from making a deduction from a sum due by a debtor in consideration of his paying the remainder before it became due? It is too evident to admit of a doubt that the constitutional provision had in view the banking or discounting which was customary at the time it was framed. The framers used the discounting in its banking sense. It was then, as it is now, a well-known fact, that bank discounting in this country has always been conducted by the deduction of the interest at the time the money is loaned and has been confined to dealing in promissory notes, bills of exchange, or other negotiable paper. It has always been the buying of bills of exchange, promissory notes, or negotiable paper for less than its face. It was such a business as that (it being usually coupled with the privilege of issuing notes as a circulating medium), that the constitution intended to restrain, by interposing obstacles to the creation of corporations, with power to engage in it."

In the case of First National Bank of Clarion v. Gruber, 87 Pa. 468, Mr. Chief Justice AGNEW said:

"If we examine the legislation of this state on the subject, it will be found, that only those known as 'banks' or 'banking institutions,' in the language of the laws, are banks of issue, and they are governed by a complete system existing since 1814. This system began in the act vetoed by Governor Snyder, and repassed on the 21st day of March, 1814. The law was followed by the Act of 25th of March, 1824, rechartering the banks then existing; many have failed, chartered by the Act of 1814. Between the date of the Act of 1824, and the passage of the General Bank Act of 16th of April, 1850, P. L. 477, many special charters were passed, but in all, the banks were subjected to the provisions of the Acts of 1814 and 1824, mostly in express words, and in some by subjecting them all to the laws relating to banks. The Act of 1824 was almost a transcript of the Act of 1814, with some amendments suggested by experience. When we reach the Act of 1850, we find it to be almost a repetition of the Acts of 1814 and 1824. Many of its sections are nearly exact transcripts. All the banks since chartered by special Acts are expressly subjected to the provisions of this Act."

In the case of Fox's Appeal, 93 Pa. 406, Mr. Justice Sᴛᴇʀʀᴇᴛᴛ said:

"The charter of the Kutztown Savings Bank, granted by the Legislature of 1869, declares, 'That the business of the corporation shall be, to receive on deposit, from time to time, such sums of money, not less than ten cents, as may be offered by tradesmen, clerks, mechanics, laborers, servants, minors, married women and others, and to invest the same in stocks of this Commonwealth or of the United States, or in the bonds of any city authorized to be issued by any Act of this Commonwealth or in other stocks or in bonds and mortgages and other improved and valid securities; the said corporation shall receive all sums of current money offered as aforesaid, and shall invest the same in the manner aforesaid.' Although styled a bank in the charter, it is expressly provided that nothing therein contained 'shall be so construed as to confer upon said corporation banking privileges:' P. L. 365.

\*    \*    \*    \*    \*    \*    \*    \*

"It is contended, that the corporation was subject to the provisions of the Act of April 16th, 1850, P. L. 477, and other statutes regulating distribution of the assets of insolvent banks and establishing an order of preference. . . . The learned auditor examined with care the several Acts of Assembly on this subject and came to the conclusion that they do not embrace savings institutions or banks, so called, which are prohibited from exercising banking privileges. In this we think he was clearly right. The Act of 1850, entitled an Act regulating banks, establishing a complete system for the organization and winding up the affairs of banks in this Commonwealth . . . . and other matters peculiar to banks of issue and discount are not applicable to banks of deposit only."

To the same effect as Fox's App., 93 Pa. 406, see Merchants' Bank of Easton v. Shouse, 102 Pa. 488; Dreisbach v. Price, 133 Pa. 560.

In the case of Anderson's Executrix v. Pennsylvania R. R. Co., 27 Pa. C. C. Rep. 76, Wᴇɪss, J., said:

"The plaintiff's contention, among others, is that this is conducting a banking business, which the company is prohibited

by the law of its charter from exercising. A bank and this saving fund are alike in this—they both receive moneys on deposit, but there the parallel ends. The latter receives money from its members, doubtless invests. it, and pays interest to the depositor. The former receives money, invests it, scalps a borrower's promissory ticket, and pays the net earnings or dividends to the stockholders. . . .

"The distinguishing characteristic of a banking business, as banking is conducted now, is doubtless discounting and negotiating promissory notes, bills and negotiable paper."

In Mercantile Bank v. New York, 121 U. S. 138 (7 Sup. Ct. Repr. 826), Mr. Justice MATTHEWS, delivering the opinion of the court, said:

"It is evident, from this enumeration of powers, that trust companies are not banks in the commercial sense of that word, and do not perform the functions of banks in carrying on the exchanges of commerce. They receive money on deposit, it is true, and invest it in loans, and so deal, therefore, in money and security for money, etc."

The distinction between a bank and a trust company is thus defined by 3 Amer. & Eng. Encyclopedia of Law (2d ed.), 791.

"The distinction between a bank and a trust company is well defined. The powers of the trust company depend upon the terms of its charter, of course, but they are banking powers. The trust company, like the savings bank, pays interest upon deposits, but its deposits are strictly loans not subject to check. It may not issue its own notes for circulation nor does it buy or sell exchange in the ordinary course of its dealings. In directions that are not akin to banking, its powers are much broader and extend outside the monetary realm into real estate transactions, trusteeships and the conduct of property interests of all kinds. The exercise by a trust company of some of the functions of a bank does not make the company a banking institution, nor lay its officers liable to prosecution for violating the banking laws."

This was the state of opinion when the constitutional convention of 1873 sat. Its acceptance of the prevailing classification which segregated banks from other corporations and informally

erected them into a separate class, was attested by the ninth and eleventh sections of the sixteenth article of the constitution, the latter of which limited the duration of the charters of banks to twenty years, and described them as corporate bodies possessing banking and discounting privileges. When the legislature of 1874 met, it realized its primary duty to put the constitution into effective action, and accordingly on April 29, 1874, there was approved "An Act to provide for the incorporation and regulation of certain corporations." The word "certain" in the title was a distinct and explicit disclaimer of universality, and this refusal to legislate in one act for all kinds of corporations had its foundation, not only in the history of legislation as summarily described above, but also in the imperative mandate of the new constitution, which forbade the incorporation of banks for a longer period than twenty years. Since the custom had arisen, and had been deemed wise, to grant charters perpetual in duration to benevolent and general business corporations, the legislature limited the act of April 29, 1874, to corporations upon which powers could be conferred in perpetuity. There is therefore no mention in the act of April 29, 1874, of any corporation which could in any manner be confounded with a banking company. The new business of insuring titles to real estate had, however, arisen, and its utility was promptly discerned by the general public. Such corporations were therefore provided for, but their function was narrowly limited.

At the time of the passage of the act of May 11, 1874, it may safely be assumed that the legislature had not in contemplation any corporation that had been, or could be, chartered under the act of April 29, 1874. It had not passed any general banking law, and the only law of that kind in effect was the act of 1860, supplemented by the act of 1861. There were, however, corporations privately chartered by other names than mere banking names, upon which had been conferred express banking privileges, while there were other corporations to which banking privileges were denied, but with privileges very similar to those now exercised by trust companies. Of the former class may be cited such as have the following words in their

charter: "The purpose of this Act is to organize and incorporate a bank and trust company, and to authorize them as such to receive money on deposit, and to transact any other business transacted by banks. . . . Provided, That nothing herein contained shall authorize said bank to issue circulating notes. . . ." Act of May 1, 1866, P. L. 1061. Or, alternatively this form: "The purpose of this Act is to incorporate a savings bank and loan and trust company; that the business of said corporation shall be to receive on deposit from all persons who shall offer the same, any sum or sums of money, not less than one dollar, and to transact any other business transacted by banks. . . . Provided, however, That nothing in this Act shall be construed to authorize the issue of circulating notes. . . ," Acts of April 10, 1873, P. L. 781; April 15, 1869, P. L. 961; April 13, 1873, P. L. 1100.

Among the names of such institutions with express banking powers, the following may be mentioned as examples: The City Deposit Bank and Trust Co. (P. L. 1866, p. 1061); The Scranton Trust Company and Savings Bank (P. L. 1869, p. 961); Citizens' and Miners' Savings Bank and Trust Co. (P. L. 1873, p. 1100); The Wiley Avenue Savings Bank of Pittsburg, Pa. (P. L. 1874, p. 471).

It will thus be seen that when the act of May 11, 1874, was under consideration, everybody knew that, so far as names went, the designation bank or banking company was insufficient to describe all the existing institutions having banking powers. To include them all, there would have had to be included some corporations having in their titles the words "Savings Bank," and others having in their titles "Trust Company," while some had both designations.

There were besides many outstanding charters whose names and exact corporate powers could not have been ascertained by a legislature in active session, but within whose four corners banking powers might probably be contained. When, therefore, the legislature determined to impose a burdensome liability upon those who engaged in the business of banking, its obvious duty was to make its meaning clear. The title was full and unmistakable, and comprehended "banks, banking companies

and other banking institutions." It limited the liability to the business of banking, but plainly meant to include all who were carrying on that business, by whatever name they might be designated.

Accordingly, when the act was adopted, a few words explanatory of the title were added in the body of the act. To interpret these words as hostile to the intent of the title would be to apply a false rule of construction, unless there were no possible escape from such an interpretation.

So far is this from being the case that it seems plain to us that a hostile intent can be read into the text only by doing violence to its plain words.

We have seen that all the names given in the body of the act are names actually borne by companies empowered to do a banking business as such. Moreover, the whole list of names in the act is qualified and dominated in the sentence itself by the phrase "Doing the business of banks or loaning and discounting moneys as such." The corporations intended to be reached, whether known as banks, banking companies, saving fund institutions, trust companies and all other incorporated companies, were to have one characteristic in order to be the companies that were meant by the act, and that characteristic was: "Doing the business of banks or loaning and discounting money as such." To our apprehension the word "or" is here used to mark an equivalent and has the same effect as if it were "that is," and it means, in the very words of the constitution, that the business of banks is loaning and discounting not loaning or discounting, the bulk of the loans being contemplated to be by the ordinary commercial process of discount. Moreover, the words "as such" though not happily chosen, have a significance of their own; they mean "as banks do."

Taking the whole subject, therefore, under consideration, we do not find any contradiction between the title and the body of this act.

We are of the opinion that the intent of the act of May 11, 1874, is to protect the public against loss by the insolvency of banks, no matter by what name they may be called; that trust companies pursuing their ordinary business are not banks within

the meaning of the act; and that, therefore, the defendants are not liable under it.

The bill is dismissed.

*Error assigned* was decree dismissing the bill.

*Walter Biddle Saul,* with him *Maurice Bower Saul,* for appellant.—The rules of construction and interpretation that have been laid down by this court, compel the construction of the act as contended for by the appellants, a construction that recognizes in a legislative enactment the adoption of a principle to be applied when occasion arises, and not a construction which looks upon a law as a mere correction of past omissions or abuses, useless as conditions change: Pocono Spring Water Ice Co. v. American Ice Co., 214 Pa. 640.

If a word used by the legislature has two meanings, one a popular meaning and the other a technical meaning, the meaning which will sustain the legislative enactment, and will give the act the broadest application, will be adopted, whether or not it is the popular or the technical meaning: Com. v. Butler, 99 Pa. 535.

Every one of the cases cited by the learned court below, in support of its position, contains an express recognition of the fact that there are several kinds of banks.

A company which receives deposits and loans or invests the same is a bank: Bldg. Association v. Seemiller, 35 Pa. 225; Oulton v. Savings Institution, 84 U. S. 109; Yungfleisch's App., 1 Walker, 125; Bright v. Mountain City Banking Co., 3 Penny. 478; Cook & Earle v. Carpenter, 12 Pa. Dist. Rep. 483.

*James Gay Gordon,* with him *W. H. Hepburn* and *John McConaghy,* for appellee.—Corporation stockholders, who have already contributed their proportions to the capital stock, are not at the common law, or in equity, liable for the corporate debts; statutes which impose this liability must therefore be strictly construed; this rule of law is well settled: Means's App., 85 Pa. 75; O'Reilly v. Bard, 105 Pa. 569; Katch v. Coal Company, 19 Pa. Superior Ct. 476.

The Union Surety and Guaranty Company was not "doing

the business of banks," for it was not, and had not, the privilege of "loaning and discounting moneys as such." No power to do this was given by its charter, and the act under which it was incorporated expressly provided against authorizing such companies "to engage in the business of banking:" First Nat. Bank of Clarion v. Gruber, 87 Pa. 468; Fox's App., 93 Pa. 406.

No matter, therefore, what the definition of a "bank" or "banking institution" may be in other states, in Pennsylvania, at the time of the passage of the act of May 11, 1874, these words had a well-defined meaning determined by statute and the adjudication of the courts. Banks in this state are corporations enjoying the privilege of discounting commercial paper, and, sometimes, in this connection, of issuing its notes as a circulating medium: Act of January 26, 1849, P. L. 21; Act of June 4, 1879, P. L. 94; Act of May 1, 1868, P. L. 108; Act of December 22, 1869, P. L. (1870) 1373; Act of March 31, 1870, P. L. 42; First Nat. Bank v. Gruber, 87 Pa. 468; Bank of Easton v. Shouse, 102 Pa. 488; Dreisbach v. Price, 133 Pa. 560; Miners' Bank, 13 W. N. C. 370; Anderson v. Penna. R. R. Co., 27 Pa. C. C. Rep. 76.

Trust companies are not banks in the commercial sense of that word, and do not perform the functions of banks in carrying on the exchange of commerce: Mercantile Bank v. Mayor, etc., 121 U. S. 138 (7 Sup. Ct. Repr. 826); State v. Reid, 28 S. W. Repr. 172; Anderson v. Penna. R. R. Co., 27 Pa. C. C. Rep. 76; Com. v. Curry, 4 Pa. Superior Ct. 356; Saving & Loan Co. v. Conover, 5 Phila. 18.

Upon the interpretation of the constitutional requirement that a legislative enactment must contain a clear statement of its subject-matter in its title, see also Dorsey's App., 72 Pa. 192; Evans v. Willistown Township, 168 Pa. 578; Payne et al. v. School District, 168 Pa. 386; Quinn v. Cumberland County, 162 Pa. 55; Sewickley Borough v. Sholes, 118 Pa. 165; Mansfield's Case, 22 Pa. Superior Ct. 224; Com. v. Samuels, 163 Pa. 283; Phila. v. Market Company, 161 Pa. 522; Com. v. Hazen, 207 Pa. 52; Pierie v. Phila., 139 Pa. 573; Stegmaier v. Jones, 203 Pa. 47; Union Pass. Ry. Co.'s App., 81* Pa. 91; Ridge Ave. Pass. Ry. Co. v. Phila., 124 Pa. 219.

OPINION BY MR. JUSTICE ELKIN, March 8, 1909:

There is but a single question to be determined on this appeal, and it is an interesting and important one. Does the Act of May 11, 1874, P. L. 135, which imposes a double liability upon the stockholders of banks, banking companies and other banking institutions, apply to trust companies incorporated under the general corporation act of 1874 and the supplements thereto? The receiver of the insolvent trust company filed a bill in equity in the court below, to enforce a double liability against stockholders who had paid the par value in full for shares of stock held by them. The learned court below, after a careful and exhaustive consideration of the question involved, reached the conclusion that the legislature had not imposed this liability upon the stockholders of trust companies, so created, and dismissed the bill. The reasons given in the opinion filed, to justify the entry of the decree, are so clear and convincing that but little can be profitably said in the further discussion of the subject. However, since the question involved is one of general public interest, it has been deemed wise to, as briefly as possible, state the views of this court upon it. In our state the privileges, powers and liabilities of banks and banking institutions have been cautiously conferred and carefully imposed. Our courts have frequently defined what a bank, or banking institution, is within the meaning of the law, and what is meant by the legislative expressions "doing a banking business," or "to engage in the business of banking," but in no instance has it been held that a trust company, deriving its powers under a special act of assembly passed prior to the adoption of the new constitution, which did not, in express terms, confer banking privileges, or which was incorporated under the general corporation Act of April 29, 1874, P. L. 73, and the supplements thereto which, in equally express terms, denied the right of such company to engage in the business of banking, was a bank or banking institution, or company doing a banking business. It is true that in the days of special legislation the legislature did create a few so-called trust companies and authorized them to do a general banking business, and such companies enjoyed whatever powers were conferred

upon them by the special charters granted. Even under these special grants of power, the courts carefully pointed out the distinction between banking institutions proper and banks so called which did not engage in a general banking business, by defining the powers and liabilities of each class of institution. This was the situation when the new constitution was adopted. In section eleven of article sixteen of that instrument, it is provided that no corporate body shall be created or organized to· possess banking and discounting privileges without three months' previous public notice being given of the intention to apply therefor, nor shall a charter for such privilege be granted for a longer period than twenty years. This is the organic law, and it cannot be laid aside or disregarded. In the present case the insolvent trust company, represented by the receiver, the appellant, was not created in pursuance of any law authorizing it to do a general banking business, nor was its incorporation preceded by three months' public notice of its intention to apply for such privileges, nor is the term of the enjoyment of the powers conferred limited to twenty years. Its charter is perpetual. If it should be determined that this trust company by its charter was authorized to engage in the business of banking, it would necessarily follow that the act of incorporation was a nullity because in violation of the plain provisions of the constitution which were not complied with. To so hold would mean the striking down of all trust companies throughout the commonwealth with their large volume of business and vast capitalization. The organization of trust companies in our state, under the general corporation act of 1874 and acts supplementary thereto, can only be sustained on the ground that they are not banks or banking institutions authorized to do a banking business. It is not necessary to resort to any strained construction of our statutes, or of our fundamental law, to reach this conclusion, because the distinction has been clearly pointed out by numerous decisions of this court, both before and after the adoption of the new constitution. Indeed, in a late case not yet reported, it was held that: "Trust companies created under the provisions of the general corporation act of 1874 and deriving their privileges and powers un-

der the Act of May 9, 1889, P. L. 159, and other supplementary statutes, are neither banks of issue, nor of discount and deposit, within the meaning of the law, and, therefore, the acts relied on as giving a preference to bank depositors, are not authority for the proposition that the same preference must be given depositors in a title and trust company incorporated for a different purpose and being denied by the express language of the statute the right to engage in the business of banking." See In re Voluntary Assignment of Prudential Trust Company. See also Commonwealth v. Commercial Bank, 28 Pa. 391; Schober v. Saving Fund and Loan Association, 35 Pa. 223; First Nat. Bank of Clarion v. Gruber, 87 Pa. 468; Fox's Appeal, 93 Pa. 406; Merchants' Bank of Easton v. Shouse, 102 Pa. 488; Dreisbach v. Price, 133 Pa. 560.

A brief review of the legislation relating to the incorporation of title insurance companies on which have been engrafted the modern trust companies, will conclusively show that the legislature never intended that they should possess banking and discounting privileges. The incorporation of title insurance companies was first authorized in paragraph twenty-nine, section nineteen of the act of 1874. Their powers were limited to the making of contracts or policies of insurance pertaining to or connected with titles to real estate. In 1881 an act was passed enlarging their powers and giving them the right to receive and hold on deposit and in trust, and as security, real and personal property, including the notes, bonds, obligations of states, individuals, companies and corporations, with the power to purchase, collect, adjust and settle, sell and dispose of the same. It was expressly provided in said act that nothing therein contained shall authorize such companies to engage in the business of banking. The act of 1889, also supplementary, added some additional powers, as, for instance, that such companies could act as assignees, receivers, guardians, executors and administrators. This act also denied such companies the right to engage in the business of banking. The act of 1895 amended the fourth section of the act of 1889 by adding the additional power "to receive deposits of moneys and other personal property, and issue their obligations therefor, to in-

vest their funds in and to purchase real and personal securities, and to loan money on real and personal securities." The insolvent trust company in the present case had no power to transact any kind of business except as conferred by the acts of assembly above mentioned and upon which all of its charter powers were based. These acts denied to it the right to do a banking business, and this is a sufficient answer to the contention of appellant made here. It is argued that the Act of May 29, 1895, P. L. 127, did not contain, as did the acts of 1881 and 1889, the provision denying such companies banking privileges and that this omission is significant as a legislative expression of an intention not to place this limitation upon them. We think this view is not tenable. These acts are all supplemental to the act of 1874, and deal with the same subject. They are in pari materia and, when so construed, there is no doubt as to their meaning in reference to banking privileges. The legislature has said that they must not engage in the business of banking, and this conclusively settles the question because they can enjoy no higher power than the statutes give them. Again, the most that can be said in support of the contention of appellant in this respect is that the act of 1895 is silent on the question of banking privileges. It does not confer any such privilege, and it would be in violation of the constitution if such an attempt had been made. The double liability of corporation stockholders does not exist unless imposed by statute, and statutes imposing such liability are strictly construed: Means's Appeal, 85 Pa. 75; McMullin v. McCreary, 54 Pa. 230; Moyer v. Penna. Slate Company, 71 Pa. 293; O'Reilly v. Bard, 105 Pa. 569.

This means that the person who asserts the right to impose a double liability upon the stockholders of a corporation, must point to the statute which imposes it. The appellant has undertaken to meet this burden by pointing out that the act of May 11, 1874, imposes a double liability upon "all stockholders in banks, banking companies, saving fund institutions, trust companies and all other incorporated companies doing the business of banks or loaning and discounting moneys as such in this commonwealth." It is contended that the words

"trust companies" used in that statute are broad enough to cover the liability of stockholders in modern trust companies. Upon this question the reasoning of the learned court below is unanswerable. The words "trust companies" used in the act of 1874 can only have reference to those trust companies created by special acts passed prior to the adoption of the new constitution, of which there are a few, and which were given the right to engage in a banking business. This is clearly indicated in the title to the act. It is an act fixing the liability of stockholders of banks and banking companies and other banking institutions. At that time there were in existence some so-called trust companies possessing the power to do a banking business, and this was the class of institutions intended to be included in this section of the act. The modern trust company did not then exist, nor was there any authority by which it could be created at that time. After that time no trust company, incorporated under the general corporation act of 1874 or its supplements, could be authorized to do a general banking business, and hence we must conclude, as did the court below, that the trust companies mentioned in the double liability act of 1874 were such as had been previously created with power to engage in the business of banking. The trust company in the case at bar had no such power, and the act does not apply to it.

As a matter of business policy on the part of trust companies and as a protection to the public dealing with these institutions, there is every reason why this double liability should be imposed on their stockholders, but this is a legislative and not a judicial question.

Decree affirmed at the cost of appellant.