ROBERT L. HOGG, *Receiver v.* WILLIAM ARMSTRONG *et al.*

(No. 6971)

Submitted March 23, 1932. Decided April 19, 1932.

*Fred O. Blue, Somerville & Somerville, B. H. Blagg* and *Poffenbarger & Poffenbarger,* for appellants.
*Charles E. Hogg,* for appellee.

LIVELY, JUDGE:

Point Pleasant Trust Company, organized in 1906, became insolvent about 1927, and this suit was instituted by its receiver against it and its several stockholders to collect from them ''double liability'', that is, $100.00 for every share of stock held by them for the purpose of paying off and discharging the liabilities of the Point Pleasant Trust Company (hereinafter called the Trust Company), accruing while they were such stockholders. The stockholders denied liability; evidence was taken before a master commissioner who made a report; and the decree of November 7, 1930, held that the Trust Company was engaged in the business of banking from the time it began business until its receiver was appointed; and that the stockholders were liable for double the amount of the par value of the stock held by them, and pronounced judgment therefor against them.

Are the stockholders subject to ''double'' liability? That is the sole question, and calls for consideration of the constitution and statutes passed in pursuance thereto; and the evidence with respect to the character of business actually carried on by the Trust Company. Plaintiff contends, in substance, that the statutes impose upon stockholders of a trust company ''double'' liability whether or not the trust

company does a banking business; that by taking charter power to do a general banking business, it is immaterial whether it engaged in purely a trust business, so far as the "double" liability of its stockholders is concerned; and that the trial chancellor was warranted in decreeing that the Trust Company transacted the business of banking. Constitution, Article XI, sec. 2, reads: "The stockholders of all corporations and joint stock companies, except banks and banking institutions, created by laws of this State, shall be liable for the indebtedness of such corporations to the amount of their stock subscribed and unpaid, and no more." It will be noted that stockholders in any corporation are liable only to the amount of their subscriptions, except banks and "banking institutions". Under section 6 of that article, the legislature is empowered to provide, by a general banking law, for the creation and organization of banks of issue or circulation, and imposes "double" liability on the stockholders of any bank whether of issue, deposit or discount. Chapter 28, Acts 1891, provided for incorporation and regulation of title and trust companies giving them power, among others, to engage in a general banking business, and to exercise all such powers necessary to carry on the business of banking, by discounting promissory notes, negotiating drafts, bills of exchange, or other evidences of debt, receiving deposits, buying and selling exchange, bank notes, bullion or coin, and by loaning money on personal or other security. In order to exercise powers of a banking institution, the corporation was required to obtain a certificate of authorization from the secretary of state. When such certificate was issued, the corporation and its stockholders were made subject to all of the provisions of chapter 54 of the code relating to banks, so far as the same are applicable. By section 1 of chapter 85, Acts 1901, the stockholders of title and trust companies, receiving certificate of power to engage in a general banking business, were made subject to all laws relating to banks of issue and circulation and of discount and deposit, so far as applicable; and by sec. 7 of that act, made subject to examination by the commissioner of banking. In 1903, by paragraph 2 of section 1, chapter 7, such

companies and their stockholders were made liable to the banking laws, *as to such business of banking* (general business of banking) engaged in by them under said para- graph 2, sec. 1. The various acts and amendments are found in chapter 54-C, Code 1923, the chapter on trust and surety companies, and chapter 34, Acts 1925. By the latter act (sec. 81a, par. 15), all trust companies, doing a *banking* business, shall be subject to that law so far as applicable to them, and to the extent that the commissioner of banking shall semi-annually examine their books, etc. By chapter 54, sec. 78a (5), trust companies engaged in a general bank- ing business are made subject to the provisions of that chapter; and by sec. 79a (6) of that chapter, the words bank or banking company used in that act are to be construed to include any bank, banker, banking company or trust com- pany; and by sec. 78a (3) of that chapter the stockholders of every bank are made subject to double liability in con- formity to sec. 6, Article XI, Constitution. Reading all these acts together, the legislative intent is reasonably clear (and we so construe them) that whenever a title, surety or trust company engages in a general banking business (as it has power to do), then its stockholders shall be liable to all the laws on banking, which includes ''double'' liability for such debts as accrue while they are stockholders. Under the Trust Company's charter, it had power to engage in a general banking business. If it exercised that power, then appellant stockholders are liable for debts accruing while they were such stockholders to an amount equal to the par value of the stock held by them (''double'' liability.) If the Trust Company did not do the business of a banking institution, then the stockholders are not ''doubly'' liable. The cause is simple and turns upon the propositions just stated. Much authority is cited, in the extensive and able briefs filed on each side, from other jurisdictions interpreting their constitu- tional and statutory provisions. Our constitution and statutes are reasonably clear, and the construction of them disposes of this cause upon these propositions. It will be noted that under paragraph 4 of sec. 1 of chapter 54-C, Code 1923, a trust company, as such, has power ''to receive

deposits of money and other personal property, and issue its obligations therefor", and to "invest its funds in, and to purchase real and personal securities, and to loan money on real and personal securities." By so doing, it does not become a bank or a banking institution. They are powers expressly given to a trust company. A trust company may be given powers incidental to a banking business, but the conferring of such powers for the purpose of facilitating its trust powers does not make it a bank or a banking institution.

We do not think a trust company is inherently a banking institution, because it has some incidental power exercised by banks or that the legislature intended to make the stockholders of a trust company subject to double liability unless it conducted a banking business. If the legislature intended to do so, plain words would have been used, expressing that intent, and not left to implication. *DeHaven* v. *Pratt,* 223 Pa. St. 633, 72 Atl. 1068; *Lankton* v. *Menefee,* (Okla.) 145 Pac. 375; *Williams* v. *Lewis Interest Co.,* 110 Ia. 535, 82 N. W. 332. The act of 1931, chap. 31, article 4, indicates that theretofore the stockholders of a trust company were not charged with double liability for debts by the former statutes; for, by that act, a trust company is defined as a banking institution, and "it was not intended that a trust company could be chartered *except in connection with the business of banking,* in order that an extraordinary liability may be placed upon the stockholders for the obligations of the company" as explained by the revisers' note appended to sec. 7 of art. 4. Before that act, trust companies could be chartered with or without banking power. Acts 1919, chap. 80, carried into Code 1923, chap. 54-C. And if they engaged in a general banking business, they were subject to the banking laws, and their stockholders liable for debts under those laws. Now, by the Code of 1931, trust companies are declared to be banking institutions, and cannot be organized except in connection with the banking business, in order that the stockholders shall be subject to the extraordinary (double) liability. If they were doubly liable before, why make them liable by this law? This legislative interpretation of the former acts is of peculiar weight as to

their meaning and intent. Section 970, 7 C. J., p. 881, says: "The distinction between a bank and a trust company is well defined. The powers of a trust company depend on the terms of its charter, of course, but they are not banking powers. The trust company, like the savings bank, pays interest on deposits, but its deposits are strictly loans not subject to check * * *. In directions that are not akin to banking, its powers are much broader and extend outside the monetary realm into real estate transactions, trusteeships, and the conduct of property interests of all kinds. The exercise of some of the functions of a bank does not make the trust company a banking institution nor lay its officers liable to prosecution for violating the banking laws."

The history of the company and its dealings, detailed in the evidence, shows that the company was organized in 1906 with a capital stock of $100,000.00 (shares $100.00 each) and began and continued its business in a 16x17 room in which two building and loan associations carried on business; it used an iron safe belonging to one of the building and loan associations and its office furniture consisted of two large desks, a library table, typewriter desk, adding machines, typewriters, and a roll-top desk; its work was carried on by the secretary-treasurer, and an assistant who transacted the insurance business of the trust company. It had no printed checks, no vaults for keeping money, did not receive money for deposit, kept no checking accounts for its customers on which checks could be drawn, and kept all its monies and securities in banks. What money came into its hands was deposited in its checking account at a bank in Point Pleasant. Its business was carried on largely with other companies in which its stockholders, or many of them, were also stockholders, namely, Point Pleasant Water & Light Company, West Virginia Malleable Iron Company, Mutual Realty Company, and Point Pleasant Grocery Company. The main purpose of the organization of the Trust Company was to finance these related companies and others to be organized, namely, Register Publishing Company, Methodist Publishing Company, Ohio River Salt Company, Security Steamboat

Company, and three or four other companies engaged in various enterprises.

The stockholders of the Merchants National Bank were largely interested in the various related companies. There were 1,000 shares of stock in the Merchants National Bank and those who owned 592 shares thereof, were also the owners of 792 shares of the Trust Company. It seems that there was no intention that the Trust Company should come into competition with the Merchants National Bank as a banking institution. Many of these related companies were successful for a period, but later, became insolvent owing large sums to the Trust Company, through which they had been financed. The commissioner's report showed that at the time the Trust Company went into the hands of the receiver, there were two classes of deposits, demand and time deposits, on the books of the company as obligations, the first, including interest, amounting to $203,000.00 in round numbers, and the second (time deposits) amounting to $31,000.00 in round numbers; it had borrowed United States bonds amounting to about $57,000.00, and owed notes amounting to about $215,000.00, and open accounts of about $900.00. The money and collectible assets which came into the receiver's hands amounted to about $13,000.00. Its worthless assets and collateral composed largely of notes of the affiliated companies and persons connected therewith amounted to five or six hundred thousand dollars. The Trust Company was woefully insolvent, because of uncollectible intangible assets and securities. It will be noted that the demand deposits amounted to about $203,000.00, including interest. This debt was to the Inter-Ocean Casualty Company, and the history of that debt is, that in about 1917, the capital stock of the Inter-Ocean Casualty Company, in which J. S. Spencer was largely interested (Spencer was the moving spirit in all these ventures), increased its capital stock from $100,000.00 to $200,000.00, of which the Trust Company took 65 or 70 thousand shares, and issued to the Inter-Ocean certificates of deposit for the purchase price. The Inter-Ocean was successful and paid dividends. The commissioner of banking of this state objected to the Trust Company's ownership of the

stock, and required it to sell, which it did and took from the purchasers notes, and new certificates of stock were issued to them by the Inter-Ocean which accepted certificates of deposit from the Trust Company to about $50,000.00. In 1922, notes of persons owing the Trust Company amounting to $139,000.00 were turned over to the Inter-Ocean, the payment being guaranteed by the Trust Company, and the Inter-Ocean surrendered to the Trust Company certificates of deposit for a like amount; in 1927, like notes amounting to $132,500.00, guaranteed by the Trust Company were turned over to the Inter-Ocean for an exchange of certificates. Neither of these transactions represented actual money. Both Spencer and Stribling say that these certificates of deposit did not represent actual monies deposited; that they were debts, the evidence of which was made in that way to make a record thereof in a bank account. Several other certificates of deposit were issued to various persons in payment of dividends declared by West Virginia Malleable Iron Company, an affiliated company organized by Spencer and financed by the Trust Company, which began to make large dividends in 1917, and up until about 1927, amounting, in the aggregate, to about $800,000.00. It had loaned its surplus money to the Trust Company, and after about 1920, it declared dividends to its stockholders payable in certificates of deposit in the Trust Company. Many of these were converted into notes, and when the companies began to be embarrassed, an effort was made to convert all these certificates of deposit into notes. The foregoing illustrates the purpose of designating these debts as "certificates of deposit". It appears that very little actual money was ever placed on deposit and certificates issued therefor. But even so, the acceptance of deposits is one of the powers expressly given to a trust company by the statute, and the exercise of that power would not, *ipso facto*, convert the Trust Company into a banking institution. The commissioner found that the Trust Company discounted paper to a "slight extent," but that the paper it did discount was not such as is usually considered bankable.

It appears that the system of issuing certificates of deposit began in the year 1909, and continued up until the Trust

Company and its various affiliated companies became insolvent. The certificates simply represented debts of the Trust Company. The history of the transactions of the Trust Company about which there is little controversy, impels us to the conclusion that it did not transact a general banking business, although it had charter power to do so, and that it did no act incidental to banking which would convert it into a banking institution, and make its stockholders amenable to the banking laws, and the double liability imposed by them.

The decree, in so far as it renders judgment against the appellants for sums equal to the amount of the stock held by them in the Point Pleasant Trust Company, will be reversed and annulled and the cause remanded.

*Reversed in part; remanded.*